# 15-3424-cv

## United States Court of Appeals

*for the*

## Second Circuit

CECIL THOMAS, JOHN DEAN, MUHAMMAD ASIF, NARESH BOORANI, MARK BOURNE, EDGAR CAMPOS, JOSE H. CANCELA, CUSH RACK CUNNINGHAM, SOLOMON DESNOES, OSCAR F. GONZALEZ, JAMES CORNELIUS GRANT, DONALD HENDRICKS, CARL HENRY, KORHAN KIZIL, DERELL LEWIS, WINSTON LINDSAY, ROSA MARIN, GONZALO V. MORALES, ANITA MOROCHO, PATRICIA E. MUNOZ, VICTOR A. OGUNBEDEDE, ALMA D. POPOCOL, ANDREW THOMPSON, IAN GEORGE THOMPSON, IREAL B. WADADA, COURTNEY SMITH, NICHOLAS BARATTA, IBRAHIM TAKANE, MARLON OLIVEIRA, MANUEL A. MIRANDA, BRANNE GONZALEZ, HAMILTON VASCO, WUILINTON MEJIA, DIOGENES A. GARCIA, AUDRE MAURICE HOLMES, HECTOR RODOLFO MARTINE ANDRADE, LAMONTE DAVID DEFRECCE, JOSEPH MORRIS, RUPPERTO PIZZO,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

JOSEPH & KIRSCHENBAUM LLP
*Attorneys for Plaintiffs-Appellants*
32 Broadway, Suite 601
New York, New York 10004
(212) 688-5640

TERENCE TOMLIN, KARL DONOVAN BUCKLE, LIONEL SMITH, LUIS D. FLORES, ISIDORO D. DIZON, JR., ERNST DENIZARD, OSCAR RODRIGUEZ, WON S. HAN, ABRAHIEM MOHAMAD, GERMAN A. MORAN RIOS, TEJDHARI RAGHUBIR, THOMAS J. GARGER, BORIS BABAEW, ADRIANA ORTELLADO, DENIZHAN OZTURK, ALEJANDRO SOLIS, HECTOR R. MARTINEZ, JOSE E. PICO, JOSE PLUTARCO PICO-ALVIA, DAISY E. ALVANADO, DEXTER C. ALEXANDER, LESTER ALEXANDER, LUIS XAVIER VILLALVA, ROBERT PERDUE, HARPAL SAWHNEY, EDUARDO FERNANDEZ, STEPHEN ANTHONY JOHN, MUHAMMAD ASHIQ, KONSTANTINOS VASILIOU, RICHARD S. ARMSTRONG, TYRONE DAVIS, ELWOOD CHAPMAN, OLIVER JACQUES SIMON, DEGOU GEORGE PAUL, HECTOR R. MARTINEZ,

*Plaintiffs-Appellants,*

— v. —

TXX SERVICES, INC., PATRICIA DOUGAN HUNT,

*Defendants-Appellees.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. v

I.   JURISDICTION .................................................................... 1

II.  ISSUES PRESENTED FOR REVIEW ......................................... 1

III. STATEMENT OF THE CASE ..................................................... 2

IV.  STATEMENT OF FACTS ......................................................... 6

    A. TXX's Business ................................................................ 6

    B. Plaintiffs' Role At TXX ..................................................... 6

    C. Plaintiffs Did Not And Could Not As A Practical Matter Work For Anyone Other Than TXX ..................................... 7

    D. Defendants Controlled The Relationship With TXX's Customers, And Plaintiffs Relied On That Relationship In Order To Render Service ............. 9

    E. TXX Assigned Plaintiffs Routes And Set Their Rates Of Pay ........... 10

    F. Defendants Exercised Control Over Plaintiffs' Schedules ................ 12

    G. Defendants Supervised And Monitored Plaintiffs' Work ................ 13

    H. Defendants Exercised Control Over Who Performed Work ............. 13

    I. Defendants Set Rules That Plaintiffs Had To Follow ..................... 14

    J. Plaintiffs' Investment In Their Work Was Small In Comparison To Defendants' Investment In The Business ......... 15

V.   SUMMARY OF ARGUMENT ..................................................... 15

VI.  ARGUMENT ........................................................................ 17

    A. Standard Of Review .......................................................... 17

i

B.  The District Court Erred In Granting Defendants' Motion For Summary Judgment ........................................................................................17

 i. Summary judgment standard .......................................................17

 ii. A reasonable jury could find that Plaintiffs were employees under the FLSA ...........................................................................................18

   a.  The district court erred in concluding that the control factor weighed in favor of finding Plaintiffs to be independent contractors ....................21

     1.  The district court erred in concluding that Plaintiffs' routes and rates were established by a bidding process ..................................................21

     2.  The district court erred by disregarding Plaintiffs' evidence that Defendants penalized drivers for refusing assignments.....................24

     3.  The district court erred in disregarding TXX's control over the relationship with TXX's client...........................................................26

     4.  The district court erred in finding that Plaintiffs could freely outsource work ............................................................................................27

     5.  The district court erred in disregarding Plaintiffs' evidence that Defendants exercised control over their schedules ............................28

     6.  The district court erred in disregarding evidence that Defendants set rules drivers had to follow....................................................................31

     7.  The district court erred in failing to credit evidence that drivers were subject to supervision and monitoring by Defendants ........................33

   b.  The district court erred in finding that the opportunity for profit or loss weighed in favor of independent contractor status ..............................36

     1.  The district court gave insufficient weight to the exclusive nature of the relationship between Plaintiffs and TXX ......................................37

     2.  The district court improperly failed to consider Defendants' control over pricing ..........................................................................................39

ii

3. The district court improperly disregarded issues of material fact regarding helpers ...............................................................................40

4. The district court erred by failing to consider the comparative investments of Plaintiffs and Defendants in evaluating Plaintiffs' opportunity for profit or loss ............................................................41

5. The district court erred in failing to consider whether Plaintiffs faced any risk of loss ....................................................................43

c. The district court erred in concluding that the degree of skill and initiative involved was essentially a neutral factor ...............................44

d. The district court erred in lessening the weight of the integral nature of Plaintiffs' work to Defendants' business based on the replaceable nature of drivers ....................................................................46

e. The district court erred in concluding that the permanence or duration of working relationship weighed in favor of independent contractor status....................................................................................47

f. Under the totality of the circumstances, a jury could find that Plaintiffs were employees under the FLSA ........................................................50

iii. A reasonable jury could find that Plaintiffs were employees under New York law ....................................................................................51

a. A reasonable jury could find that Plaintiffs did not work at their own convenience....................................................................................52

b. A reasonable jury could find that Plaintiffs were not free to engage in other employment ............................................................................53

c. The fact that Defendants did not include Plaintiffs in their payroll or provide them with fringe benefits is not probative ...............................54

d. A reasonable jury could find that Plaintiffs worked a fixed schedule ..55

e. A reasonable jury could find that Defendants exercised sufficient control over Plaintiffs to render Plaintiffs employees .........................55

iii

VII. CONCLUSION ................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Anikushina v. Moodie*,
    58 A.D.3d 501 (N.Y. App. Div. 1st Dep't 2009) ........................53,54,56,57

*Artola v. MRC Express, Inc.*, No. 14 CV 23219,
    2015 U.S. Dist. LEXIS 130183 (S.D. Fla. Sept. 25, 2015)..........29,31

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436 (10th Cir. 1998)....48

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
    537 F.3d 132 (2d Cir. 2008) .......................................................17,20,35

*Bermudez v. Ruiz*, 185 A.D.2d 212 (N.Y. App. Div. 1st Dep't 1992) ...53,55,56,57

*Bobbit v. Broadband Interactive, Inc.*, No. 11 CV 2855,
    2013 U.S. Dist. LEXIS 150854 (M.D. Fla. Oct. 21, 2013)..........29,31,47

*Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987)............19,27,41

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988).................*passim*

*Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193 (2003)............................16,51,57

*Dixon v. Zabka*, No. 11 CV 982,
    2014 U.S. Dist. LEXIS 159692 (D. Conn. Nov. 13, 2014)..........46

*Dole v. Snell*, 875 F.2d 802 (10th Cir. 1989).........................................*passim*

*Donovan v. Dialamerica Marketing, Inc.*,
    757 F.2d 1376 (3d Cir. 1985) ......................................................47,48

*Gayle v. Harry's Nurses Registry, Inc.*,
    594 Fed. Appx. 714 (2d Cir. 2014) .............................................35

*Gayle v. Harry's Nurses Registry, Inc.*, No. CV-07-4672,
    2009 U.S. Dist. LEXIS 17768 (E.D.N.Y. Mar. 9, 2009) .............35,47

*Hart v. Rick's Cabaret Int'l, Inc.*,
    967 F. Supp. 2d 901 (S.D.N.Y. 2013) ..........................................51,53,54

*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) ..............................17

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010) ..................18,26

*Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015) ..........*passim*

*Kinney v. Artist & Brand Agency LLC*, No. 13 CV 8864,
    2015 U.S. Dist. LEXIS 160465 (S.D.N.Y. Nov. 25, 2015) .........37

*Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447 (S.D.N.Y. 2002) .....40

*Lewis v. ASAP Land Express, Inc.*,
    554 F. Supp. 2d 1217 (D. Kan. 2008) .........................................*passim*

*Lopez v. Silverman*, 14 F. Supp. 2d 405 (S.D.N.Y. 1998).....................38

*Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243 (2d Cir. 2002) ......22,50

*Ruiz v. Affinity Logistics Corp.*,
    754 F.3d 1093 (9th Cir. 2014) .....................................................27,29,31,34

*Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013) ..........*passim*

*Schwind v. EW & Assocs., Inc.*,
    357 F. Supp. 2d 691 (S.D.N.Y. 2005) .........................................38

*Sec'y of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987) .................43

*Slayman v. FedEx Ground Package Sys.*,
    765 F.3d 1033 (9th Cir. 2014) .....................................................32

*Solis v. Kansas City Transp. Group*, No. 10-087-CV,
    2012 U.S. Dist. LEXIS 122047 (W.D. Mo. Aug. 28, 2012) ........27

*Swinney v. AMcomm Telecomms., Inc.*, 30 F. Supp. 3d 629
    (E.D. Mich. 2014).......................................................................25,29

*Thomas v. TXX Servs., Inc.*, No. CV 13-2789,
   2015 U.S. Dist. LEXIS 134829 (E.D.N.Y. Sept. 30, 2015) ......... 6

*Thomas v. TXX Servs., Inc.*, No. CV 13-2789,
   2015 U.S. Dist. LEXIS 135027 (E.D.N.Y. May 22, 2015) .......... 5

*United States v. Rosenwasser*, 323 U.S. 360 (1945) ............................. 18

*Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308 (5th Cir. 1976) ......... 28,39,44

*Wrobel v. County of Erie*, 692 F.3d 22 (2d Cir. 2012) ........................... 17

**Statutes, Rules, and Regulations**

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

28 U.S.C. § 1367 ...................................................................... 1

29 U.S.C. § 201 ....................................................................... 1

29 U.S.C. § 203 ....................................................................... 18

29 U.S.C. § 216 ....................................................................... 2

Fed R. Civ. P. 23 ..................................................................... 2

Fed. R. Civ. P. 30 .................................................................... 4,5,14,33

Fed. R. Civ. P. 56 .................................................................... 1,17

Local Civil Rule 56.1 ............................................................... 4

**Other Authorities**

U.S. Dep't of Labor, Administrator's Interpretation No. 2015-1
   (July 15, 2015) ..............................................................*passim*

## I.    JURISDICTION

The district court had original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiffs asserted claims for unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*.  The district court had jurisdiction over Plaintiffs' state law wage and hour claims pursuant to 28 U.S.C. § 1367 because the state law claims were so related to the FLSA claims that they formed part of the same case or controversy.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final order and judgment.  Specifically, this is an appeal from the district court's dismissal of the action pursuant to Fed. R. Civ. P. 56.

The district court's order granting Defendants' motion for summary judgment was entered on September 30, 2015.  The judgment was entered on October 14, 2015.  Plaintiffs filed their notice of appeal on October 27, 2015.

## II.   ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in granting Defendants' motion for summary judgment.

2.    Whether the district court misapplied the summary judgment standard by resolving factual disputes in Defendants' favor, failing to credit Plaintiffs' evidence, and failing to make all reasonable inferences in Plaintiffs' favor.

3.    Whether the district court erred in holding that Plaintiffs were independent contractors under the FLSA and New York Labor Law ("NYLL") as a matter of law.

## III.    STATEMENT OF THE CASE

Plaintiffs Cecil Thomas[1] and John Dean (collectively, "Plaintiffs"), filed their complaint against Defendants TXX Services, Inc. ("TXX") and Patricia Dougan Hunt (together with TXX, "Defendants") on May 9, 2013.  (Dkt. No. 1[2].) The complaint alleged that Defendants violated the FLSA and New York law by misclassifying Plaintiffs and other delivery drivers as independent contractors and, as a result, failing to pay them overtime and taking unlawful deductions.  (A47-61.)  Plaintiffs pled their FLSA claims as collective claims pursuant to 29 U.S.C. § 216(b) and their New York claims as class claims pursuant to Fed. R. Civ. P. 23. (A51-55.)  While no motion for conditional certification of the FLSA claims had been made when the case was dismissed, approximately 73 individuals (the "Opt-In Plaintiffs") in addition to the Plaintiffs filed consent to sue forms.[3]  (Dkt. Nos. 6-

---

[1] Plaintiffs' counsel have been advised that Plaintiff Cecil Thomas passed away during the pendency of this appeal.

[2] Unless otherwise indicated, all docket references herein are to the district court docket.

[3] Because no conditional certification motion has been made, there has not yet been any judicial finding as to whether the Opt-In Plaintiffs are or are not similarly situated to Plaintiffs.

2

38, 41-59, 64-66, 69-74, 76, 79, 82, 94-95, 98-99, 146, 148, 152.)  Defendants did

not file a motion to dismiss but instead filed their answer on July 3, 2013.  (Dkt.

No. 67.)

Before the Initial Conference, the parties jointly submitted a proposed

scheduling order.  (Dkt. No. 75.)  District Judge Sandra J. Feuerstein held the

Initial Conference on September 12, 2013.  (Dkt. No. 81.)  At the Conference,

Judge Feuerstein raised the question of whether the court had subject matter

jurisdiction under the FLSA because Plaintiffs had signed independent contractor

agreements.[4]  (Pls.' Mem. in Opp. to Defs.' Mot. for Judgment on the Pleadings at

2 (Dkt. No. 84).)  Thereafter, Defendants filed a motion for judgment on the

pleadings on the basis that Plaintiffs were independent contractors and attached to

their motion numerous declarations and exhibits.  (Dkt. Nos. 80, 83.)  In their

opposition, Plaintiffs argued that Defendants' declarations and exhibits should not

be considered, as a motion for judgment on the pleadings is limited to the

allegations in the complaint.  (Dkt. No. 84, at 12.)  Plaintiffs further argued that the

motion should not be converted to a summary judgment motion, since the parties

had not engaged in full (or any) discovery.  (*Id*. at 17-18.)  In the event that the

motion were converted to a summary judgment motion, Plaintiffs submitted five

driver declarations with their opposition papers.  (Dkt. Nos. 85-89.)  Judge

---

[4] When Plaintiffs' counsel attempted to obtain transcripts of the hearings in this
case, they were advised that the hearings had not been recorded or transcribed.

3

Feuerstein referred the motion to Magistrate Judge William D. Wall for a report and recommendation. (Dkt. No. 93.) On April 14, 2014, Judge Wall recommended that Defendants' motion be denied and that the motion not be converted to a motion for summary judgment. (Dkt. No. 106 at 4, 9.) Defendants filed an objection to Judge Wall's report and recommendation. (Dkt. No. 107.)

During a June 24, 2014 telephone conference, Judge Feuerstein converted the motion for judgment on the pleadings to a motion for summary judgment rather than adopting or modifying Judge Wall's report and recommendation. (A659-60.) She stated that Defendants did not have to submit any additional papers in connection with the converted motion, and that Plaintiffs must file any supplemental summary judgment papers by August 6, 2014, which was later extended to September 8, 2014 due to the Fed. R. Civ. P. 30(b)(6) witnesses' family emergency. (Dkt. Nos. 115, 116, 128; A660.) In compliance with Judge Feuerstein's order, all parties' motion papers for Defendants' motion for judgment on the pleadings were refiled in connection with the converted summary judgment motion. (Dkt. No. 130; *compare* Dkt. Nos. 83-92 *with* Dkt. Nos. 131-140.) Because of this, no Local Civil Rule 56.1 statement or counter-statement was filed. Plaintiffs filed a supplemental response and summary judgment motion, to which Defendants responded. (Dkt. Nos. 141-145.)

4

Before the summary judgment deadline, Plaintiffs conducted a Fed. R. Civ. P. 30(b)(6) deposition of Defendant TXX Services, Inc. (A686.) Defendants did not depose the Plaintiffs. Plaintiffs issued deposition and document subpoenas for Bellco, one of TXX's customers, and a Bellco employee. (A663-65; A667-69.) Defendants moved to quash the subpoenas, and Judge Feuerstein quashed them on August 6, 2014. (SPA3-4.) Accordingly, the summary judgment record consisted of the declarations and exhibits thereto initially filed in connection with Defendants' motion for judgment on the pleadings and the transcript of the 30(b)(6) deposition and certain exhibits thereto. (A63-641; A694-775; A796-807.)

Judge Feuerstein referred the summary judgment motion to Magistrate Judge Steven I. Locke for a report and recommendation. (A42, Sept. 29, 2014.) On May 22, 2015, Judge Locke recommended that Defendants' motion be granted based on his finding that Plaintiffs were independent contractors and not employees under the FLSA and New York law. *Thomas v. TXX Servs., Inc.*, No. CV 13-2789, 2015 U.S. Dist. LEXIS 135027 (E.D.N.Y. May 22, 2015) (SPA5-44). Plaintiffs filed a timely objection to Judge Locke's report and recommendation. (Dkt. No. 160; A44, June 4, 2015.) In their objection, Plaintiffs identified specific ways in which Judge Locke misapplied the summary judgment standard. Namely, Judge Locke resolved factual disputes in Defendants' favor, disregarded Plaintiffs' evidence, improperly weighed the evidence, and failed to make all reasonable inferences in

5

Plaintiffs' favor.  (Dkt. No. 160.)  Nonetheless, on September 30, 2015, Judge

Feuerstein adopted Judge Locke's report and recommendation in its entirety.

*Thomas v. TXX Servs., Inc.*, No. CV 13-2789, 2015 U.S. Dist. LEXIS 134829

(E.D.N.Y. Sept. 30, 2015) (SPA45-49).  Judgment was entered dismissing the

complaint on October 14, 2015.  (SPA50.)  Plaintiffs filed their notice of appeal on

October 27, 2015.  (A827.)

## IV.   STATEMENT OF FACTS

### A. TXX's Business

TXX contracts with its customers to provide for delivery of the customers'

goods.  (SPA7-8.)  It is TXX's "obligation to get the freight delivered."  (Aug. 22,

2014 Dep. of John Hunt ("Hunt Dep.") 23:13-14 (A702).)  TXX operates three

facilities where its customers deliver their goods and drivers pick up the goods for

delivery to their final destination.  (*Id*. at 12:20-13:14, 18:18:22-19:9, 29:17-30:9

(A699, A701, A703-704).)

### B. Plaintiffs' Role At TXX

Plaintiffs worked for TXX as drivers making deliveries for TXX's

customers for many years.  Plaintiff Dean worked in that capacity for nearly four

years, and Plaintiff Thomas worked in that capacity for over 15 years.  (Oct. 16,

2013 Decl. of John Dean ("Dean Decl.") ¶ 3 (A383); Oct. 16, 2013 Decl. of Cecil

Thomas ("Thomas Decl.") ¶ 3 (A402).)  During that time, Plaintiffs worked

6

exclusively and on a full-time basis for TXX.  (Dean Decl. ¶¶ 29-30 (A386-87); Thomas Decl. ¶¶ 7, 33 (A402-403, A406).)  TXX did not require drivers to have prior professional driving experience.  (Dean Decl. ¶ 5 (A383); Thomas Decl. ¶ 5 (A402); *see also* Oct. 16, 2013 Decl. of Joseph Morris ("Morris Decl.") ¶ 5 (A392); Oct. 17, 2013 Decl. of Derek Lewis ("Lewis Decl.") ¶ 5 (A412); Oct. 18, 2013 Decl. of Harpay S. Sawhney ("Sawhney Decl.") ¶ 5 (A421).) TXX required Plaintiffs to form business entities in order to work for TXX.  (Dean Decl. ¶ 45 (A389); Thomas Decl. ¶ 49 (A408); *see also* Morris Decl. ¶ 41 (A397); Lewis Decl. ¶ 45 (A418); Sawhney Decl. ¶ 51 (A428).)  Plaintiffs signed various contracts over the years regarding their relationship with TXX.  (A296-341.) These contracts were either silent about the duration of the agreements (*see* A300-302 (Plaintiff Dean); A316-323 (Plaintiff Dean); A297-98 (Plaintiff Thomas); A306-312 (Plaintiff Thomas)) or were automatically renewable and were in fact regularly renewed.  (A337, paragraph "NINTEENTH" [*sic*]; A328, paragraph "NINTEENTH" [*sic*]; Dean Decl. ¶ 3 (A383); Thomas Decl. ¶ 3 (A402); *see also* Morris Decl. ¶ 3 (A392); Lewis Decl. ¶ 3 (A412); Sawhney Decl. ¶ 3 (A421).)

### C. Plaintiffs Did Not And Could Not As A Practical Matter Work For Anyone Other Than TXX

As set forth above, Plaintiffs worked exclusively for TXX.  TXX's contracts with Plaintiffs either were silent regarding whether Plaintiffs could work for others (*see* A297-323) or purported to allow Plaintiffs to work for others, subject to

7

customer approval (*see* A327-28, paragraph "FIFTEENTH"; A336-37, paragraph "FIFTEENTH"). However, as a practical matter Plaintiffs could not work for anyone other than TXX. Plaintiffs worked, on average, 67 or 89 hours per week for Defendants. (Dean Decl. ¶ 29 (A386); Thomas Decl. ¶ 32 (A406).) Defendants caused Plaintiffs to work these long hours by barring drivers from turning down deliveries or shifts under threat of taking away routes. (Dean Decl. ¶¶ 12-13 (A384); Thomas Decl. ¶¶ 14-15 (A403-404); *see also* Lewis Decl. ¶¶ 11-12 (A413); Morris Decl. ¶ 12 (A393); Sawhney Decl. ¶¶ 12-13 (A422).) As a result, they had no time to work for anyone other than TXX. (Thomas Decl. ¶ 7 (A402-403).) Other drivers similarly worked full time and on an exclusive basis for Defendants. (Morris Decl. ¶¶ 29, 30 (A395-96); Lewis Decl. ¶¶ 29, 32 (A416); Sawhney Decl. ¶¶ 29, 34 (A425-26).)

In addition, because Plaintiffs carried pharmaceutical products, they could not carry other cargo simultaneously and, therefore, work simultaneously for multiple companies. (Thomas Decl. ¶ 7 (A402-403).) In fact, one of the contracts Plaintiffs signed anticipates that certain cargo cannot be mixed with other customers' cargo. (A336-37, paragraph "FIFTEENTH"; A327-28, paragraph "FIFTEENTH".)

### D. Defendants Controlled The Relationship With TXX's Customers, And Plaintiffs Relied On That Relationship In Order To Render Service

TXX enters into contracts with its customers in which TXX agrees to arrange for delivery of its customers' merchandise to TXX's customers' customers. (Hunt Dep. 22:8-12, 23:19-25 (A701-702).)  Although Plaintiffs made these deliveries, TXX maintained complete control over the relationship with TXX's customers.  Both Plaintiffs as well as three other driver-declarants uniformly stated that they had no business relationship with TXX's customers.  (Dean Decl. ¶¶ 30-31 (A387); Thomas Decl. ¶¶ 33-34 (A406); *see also* Morris Decl. ¶¶ 30-31 (A396); Lewis Decl. ¶¶ 32-33 (A416); Sawhney Decl. ¶¶ 34-35 (A426).)  TXX – not Plaintiffs – entered into the contracts with its customers, and TXX negotiated with its customers to determine what the customers would pay for delivery services. (Hunt Dep. 20:24-21:3 (A701).)  Plaintiffs had no role in setting the prices that TXX's customers paid.  (*Id*. at 21:4-9.)

In fact, TXX prohibited Plaintiffs and other drivers from contracting directly with TXX's customers or working independently for TXX's customers.  (Dean Decl. ¶ 31 (A387); Thomas Decl. ¶ 34 (A406); Morris Decl. ¶ 31 (A396); Lewis Decl. ¶ 33 (A416); Sawhney Decl. ¶ 35 (A426).)  When there were delivery problems – such as late deliveries – customers complained directly to TXX, not to

the drivers.  (Dean Decl. ¶ 32 (A387); Thomas Decl. ¶¶ 35-36 (A406-407); Morris

Decl. ¶ 32 (A396); Lewis Decl. ¶ 34 (A416); Sawhney Decl. ¶¶ 32, 36 (A425-26).)

### E.  TXX Assigned Plaintiffs Routes And Set Their Rates Of Pay

TXX assigned drivers routes and set their compensation.  TXX paid

Plaintiffs and other drivers by the stop.  (Dean Decl. ¶ 33 (A387); Morris Decl. ¶

33 (A396); Thomas Decl. ¶ 37 (A407); Lewis Decl. ¶ 35 (A416); Sawhney Decl. ¶

37 (A426).)  Plaintiffs and Plaintiffs' declarants stated that they were unable to

negotiate their pay rates with TXX.  (Morris Decl. ¶¶ 33-34 (A396); Dean Decl. ¶¶

33-34 (A387); Lewis Decl. ¶¶ 35-36 (A416-417); Thomas Decl. ¶¶ 37-38 (A407);

Sawhney Decl. ¶¶ 37-38 (A426).)  While Defendants contend that a bidding

system was in place, there was no such system, as Defendants controlled what it

paid drivers.  To be sure, Plaintiffs and Plaintiffs' declarants could not negotiate

for higher rates, and when they attempted to do so, TXX threatened to replace

them.  (Morris Decl. ¶ 34 (A396); Dean Decl. ¶ 34 (A387); Lewis Decl. ¶ 36

(A417); Thomas Decl. ¶ 38 (A407); Sawhney Decl. ¶ 38 (A426).)  Moreover, TXX

often unilaterally decided to pay Plaintiffs and other drivers less than TXX had

previously promised to pay.  (Dean Decl. ¶ 37 (A388); Morris Decl. ¶ 37 (A396);

Thomas Decl. ¶ 41 (A407); Lewis Decl. ¶ 39 (A417); Sawhney Decl. ¶ 41 (A426).)

Plaintiffs did not bill TXX for their work, as in a typical independent contractor

relationship. Instead, TXX generated the invoices for the moneys due to drivers and then paid drivers based on those invoices. (Hunt Dep. 111:25-112:7 (A724).)

Defendants have not and cannot establish that Plaintiffs meaningfully bid on their routes, which remained the same for years. (Morris Decl. ¶¶ 3, 25 (A392, A395); Dean Decl. ¶¶ 3, 25 (A383, A386); Lewis Decl. ¶¶ 3, 26 (A412, A415); Thomas Decl. ¶¶ 3, 27 (A402, A405); Sawhney Decl. ¶¶ 3, 25 (A421, A424).) Plaintiffs' ability to turn down assignments was largely theoretical. Plaintiffs' declarants all stated that they were threatened with losing their routes for refusing assignments. (Dean Decl. ¶¶ 12-13 (A384); Lewis Decl. ¶¶ 11-12 (A413); Morris Decl. ¶ 12 (A393); Thomas Decl. ¶¶ 14-15 (A403-404); Sawhney Decl. ¶¶ 12-13 (A422).) Declarant Lewis identified a dispatcher who threatened to take work away from or terminate Lewis if he refused work. (Lewis Decl. ¶ 12 (A413).) Lewis also described several specific incidents where he was threatened with termination when he had difficulties getting to TXX's facility. (*Id*. at ¶¶ 14-16 (A413-414).) Lewis was in fact terminated when he missed a day of work. (*Id*. at ¶ 17 (A414).) Similarly, Declarant Sawhney was terminated by a dispatcher when, during a gas shortage, he did not have enough gas to get to TXX's warehouse. (Sawhney Decl. ¶ 14 (A422).)

### F. Defendants Exercised Control Over Plaintiffs' Schedules

Defendants required all drivers to report to TXX's facility between 5:30 a.m. and 5:45 a.m. (Dean Decl. ¶¶ 16-17 (A385); Morris Decl. ¶¶ 14-15 (A393-94); Thomas Decl. ¶¶ 17-18 (A404); Lewis Decl. ¶¶ 19-20 (A414); Sawhney Decl. ¶ 17 (A423).) Defendants enforced this start time by withholding work from late-arriving drivers, making them wait for work on a standby basis, and/or fining them. (Dean Decl. ¶¶ 17-19 (A385); Morris Decl. ¶¶ 15-18 (A394); Thomas Decl. ¶¶ 18-20 (A404); Lewis Decl. ¶¶ 20-21 (A414); Sawhney Decl. ¶ 17 (A423).) These penalties applied even when a driver was as little as five minutes late. (Sawhney Decl. ¶ 17 (A423).) Once drivers arrived at Defendants' facility, they were not allowed to leave for several hours, until TXX allowed them to leave. (Dean Decl. ¶ 20 (A385); Morris Decl. ¶ 19 (A394); Thomas Decl. ¶ 21 (A404); Lewis Decl. ¶ 22 (A414-415); Sawhney Decl. ¶ 18 (A423).)

Plaintiffs' declarants also stated that (1) TXX gave them their delivery schedules and (2) if they did not adhere to that schedule, a TXX representative reprimanded them. (Thomas Decl. ¶¶ 23-25 (A404-405); Sawhney Decl. ¶¶ 22-23 (A424); Dean Decl. ¶¶ 21-23 (A385-86); Morris Decl. ¶¶ 21-23 (A394-95).) Plaintiff Dean stated that when he made a late delivery, TXX did not pay him for that stop. (Dean Decl. ¶ 25 (A386).) Defendants further controlled drivers' schedules by requiring drivers to get permission to take days off work. (Lewis

12

Decl. ¶ 13 (A413); Dean Decl. ¶ 15 (A384); Morris Decl. ¶ 13 (A393); Thomas

Decl. ¶ 16 (A404); Sawhney Decl. ¶ 16 (A423).)

### G. Defendants Supervised And Monitored Plaintiffs' Work

Contrary to Defendants' contentions, Plaintiffs were subject to supervision

and monitoring by Defendants during their shifts.  For example, TXX's dispatcher

or floor manager called to reprimand Plaintiffs and other drivers when they did not

make deliveries on time or in the proper order.  (Dean Decl. ¶ 23 (A386); Morris

Decl. ¶ 23 (A395); Thomas Decl. ¶ 25 (A405); Lewis Decl. ¶ 25 (A415); Sawhney

Decl. ¶ 23 (A424).)  TXX monitored Plaintiffs' movements via GPS, and

Defendants prohibited drivers from taking breaks.  (Dean Decl. ¶ 29 (A386-87);

Morris Decl. ¶ 24 (A395); Thomas Decl. ¶ 26 (A405); Lewis Decl. ¶¶ 30-31

(A416); Sawhney Decl. ¶ 29 (A425).)  One of Plaintiffs' declarants stated that

TXX called him if he did take breaks to tell him to get back to work.  (Lewis Decl.

¶ 31 (A416).)  TXX also required Plaintiffs to call in at the end of the day to

confirm that they completed their deliveries.  (Dean Decl. ¶ 28 (A386); Morris

Decl. ¶ 28 (A395); Thomas Decl. ¶ 30 (A405-406); Lewis Decl. ¶ 28 (A415);

Sawhney Decl. ¶ 28 (A425).)

### H. Defendants Exercised Control Over Who Performed Work

Contrary to the language in the contracts Plaintiffs signed, they were not free

to outsource their work to others.  Instead, Plaintiffs' declarants expressly stated

13

that as a matter of practice TXX had to approve any sharing of stops or routes, including the use of helpers.  (Lewis Decl. ¶ 18 (A414); Dean Decl. ¶ 14 (A384); Sawhney Decl. ¶ 15 (A423).)

## I.  Defendants Set Rules That Plaintiffs Had To Follow

Defendants set rules that Plaintiffs had to follow.  Defendants set requirements for the type of vehicles drivers used to perform their work.  (Morris Decl. ¶ 8 (A393); Dean Decl. ¶ 8 (A384); Lewis Decl. ¶ 8 (A413); Thomas Decl. ¶ 10 (A403); Sawhney Decl. ¶ 8 (A422).)  Defendants also required drivers' vehicles to have tinted windows.  (Thomas Decl. ¶ 55 (A409); Morris Decl. ¶ 47 (A398).)

TXX also gave Plaintiffs certain "Notices to All Independent Owner-Operators" purporting to be from a number of different TXX customers that were "essentially identical."  (SPA15; A356-365; A367-68.)  The notices, including one purporting to be from a bank, referred to "controlled substance[s]." (A358 (notice for Capital One bank); *see also* A356-57; A359-65; A367-68.)  In light of this, it is reasonable to conclude that the Notices were prepared by TXX, and not TXX's customers.[5]

---

[5] While TXX now contends that the notices were created by its customers, TXX's 30(b)(6) witness testified that he did not know whether TXX or its customers prepared the notices.  (Hunt Dep. 49:15-20 (A708); Oct. 3, 2013 Decl. of Juan Baquero ("Baquero Decl.") ¶ 15 (A288).)

14

### J. Plaintiffs' Investment In Their Work Was Small In Comparison To Defendants' Investment In The Business

Plaintiffs paid for their vehicles, related expenses, and virtually nothing else. (Dean Decl. ¶¶ 7, 48 (A384, A389); Thomas Decl. ¶¶ 9, 51 (A403, A409); *see also* Morris Decl. ¶¶ 7-8, 43 (A393, A398); Lewis Decl. ¶ 7 (A413); Sawhney Decl. ¶ 56 (A429).) They used their vehicles for personal as well as business purposes. (Dean Decl. ¶ 7 (A384); Thomas Decl. ¶ 9 (A403); Morris Decl. ¶ 7 (A393); Lewis Decl. ¶ 7 (A413); Sawhney Decl. ¶ 7 (A422).) This investment paled in comparison to Defendants' extensive investments in their business, including multiple facilities and staff, such as dispatchers, sales staff, account coordinators, managers, and executives. (Hunt Dep. 6:21-22, 64:18-20, 97:12-17, 114:2-15 (A697, A712, A720, A725)); Nov. 5, 2013 Decl. of Michael Mills ("Mills Decl.") ¶ 1 (A468); Baquero Decl. ¶ 1 (A285); Morris Decl. ¶ 9 (A393).)

### V. SUMMARY OF ARGUMENT

This Court should reverse the district court's decision granting Defendants' motion for summary judgment. There are material factual disputes regarding (1) whether Plaintiffs were economically dependent on Defendants and (2) the degree of control Defendants exercised over Plaintiffs that preclude a finding on summary judgment that Plaintiffs were independent contractors under the FLSA or NYLL. *Brock v. Superior Care, Inc.* ("*Superior Care*"), 840 F.2d 1054, 1059 (2d Cir. 1988) (stating that in determining whether a worker is an employee under the

15

FLSA,"[t]he ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves"); *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003) ("[T]he critical inquiry in determining whether an employment relationship exists [under NYLL] pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results.").

The district court misapplied the summary judgment standard in finding that there were no material factual disputes relating to whether Plaintiffs were employees. The district court erred by crediting Defendants' evidence over Plaintiffs' where there were factual disputes and failing to make all reasonable inferences in Plaintiffs' favor. The district court also erred by disregarding Plaintiffs' evidence concerning their economic dependence on Defendants and Defendants' control over Plaintiffs.

The district court also misapplied the FLSA's economic reality test and New York's control test to the factual record. The district court failed to consider all pertinent factors and at times applied an incorrect legal standard to the factors it considered.

Plaintiffs provided sufficient evidence from which a reasonable jury could conclude that every factor of the economic reality test weighs in favor of finding

Plaintiffs to be Defendants' employees under the FLSA, and Plaintiffs were economically dependent on Defendants. Similarly, Plaintiffs provided sufficient evidence from which a reasonable jury could conclude that Defendants exercised sufficient control over Plaintiffs to be their employers under the NYLL. Accordingly, Defendants were not entitled to summary judgment.

## VI. ARGUMENT

### A. Standard Of Review

A summary judgment decision is subject to *de novo* review. *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008); *see also Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013). All of the issues raised in this appeal are therefore subject to *de novo* review.

### B. The District Court Erred In Granting Defendants' Motion For Summary Judgment

#### i. Summary judgment standard

Summary judgment may be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court reviews "de novo a grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor." *Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012). "In determining whether the moving party is entitled to judgment as a matter of law or whether instead there is sufficient

17

evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (internal citations and quotation marks omitted). "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit, for the court in considering such a motion *must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Id*. (internal quotation marks omitted, emphasis in original).

### ii. A reasonable jury could find that Plaintiffs were employees under the FLSA

Under the FLSA, an "employee" is "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g). As the Supreme Court has noted, "[a] broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945). To be sure, in a recent Administrator's Interpretation, the U.S. Department of Labor ("DOL") stated that "most workers are employees under the FLSA's broad definitions." U.S. Dep't of Labor, Administrator's Interpretation No. 2015-1, at 15

18

(July 15, 2015) ("Admin. Interpretation No. 2015-1"), *available at*

http://www.dol.gov/whd/workers/Misclassification/AI-2015_1.pdf.

To decide whether an individual is an employee or an independent

contractor under the FLSA, a court applies the economic reality test. "The ultimate

concern is whether, as a matter of economic reality, the workers depend upon

someone else's business for the opportunity to render service or are in business for

themselves." *Superior Care*, 840 F.2d at 1059. To determine whether a worker is

an employee, a court must consider the totality of the circumstances, including but

not limited to the following factors:

> (1) the degree of control exercised by the employer over the workers,
> (2) the workers' opportunity for profit or loss and their investment in
> the business, (3) the degree of skill and independent initiative required
> to perform the work, (4) the permanence or duration of the working
> relationship, and (5) the extent to which the work is an integral part of
> the employer's business.

*Id*. at 1058-1059. "The existence and degree of each factor is a question of fact

while the legal conclusion to be drawn from those facts . . . is a question of law."

*Id*. at 1059. "Since the test concerns the totality of the circumstances, any relevant

evidence may be considered, and mechanical application of the test is to be

avoided." *Id*. As the name suggests, the economic reality test is concerned with

the reality of what happened – not with policies that may or may not be followed.

*Brock v. Mr. W Fireworks, Inc.* ("*Mr. W*"), 814 F.2d 1042, 1047 (5th Cir. 1987)

("[I]t is not what the operators *could* have done that counts, but as a matter of

19

economic reality what they actually *do* that is dispositive."); *see also Dole v. Snell* ("*Snell*"), 875 F.2d 802, 808 (10th Cir. 1989) (same). Because the economic reality test requires a fact-intensive analysis, typically questions of employee status cannot be resolved on summary judgment. *Cf. Barfield*, 537 F.3d at 143-44 (applying economic reality test in joint employer case and noting that "[b]ecause of the fact-intensive character of a determination of joint employment, we rarely have occasion to review determinations made as a matter of law on an award of summary judgment").

Resolving all factual disputes and making all reasonable factual inferences in Plaintiffs' favor, a reasonable jury could conclude that Plaintiffs were economically dependent on Defendants and, therefore, employees under the FLSA. In concluding that Plaintiffs were independent contractors as a matter of law, the district court erred by (1) resolving factual disputes in Defendants' favor; (2) disregarding Plaintiffs' evidence; and (3) misapplying the economic reality test. In short, the district court mistakenly made factual findings regarding "[t]he existence and degree of each factor" when the record was rife with material factual disputes. *Superior Care*, 840 F.2d at 1059.

20

### a. The district court erred in concluding that the control factor weighed in favor of finding Plaintiffs to be independent contractors

Resolving all ambiguities and crediting all factual assertions in Plaintiffs' favor, a jury could conclude that Defendants exercised substantial control over Plaintiffs and that this favor weighs strongly in favor of finding Plaintiffs to be employees. Accordingly, the district court's conclusion on summary judgment that the control factor weighed in favor of independent contractor status was error.

#### 1. The district court erred in concluding that Plaintiffs' routes and rates were established by a bidding process

Plaintiffs set forth evidence that TXX assigned drivers routes and set their compensation without bidding.[6] Other than merely asserting that drivers can bid, Defendants have provided no explanation of the bidding system under which Plaintiffs purportedly operated.[7] On summary judgment, Defendants' assertion that Plaintiffs could and did negotiate their pay and/or bid for work cannot be credited over Plaintiffs' evidence that TXX controlled their routes and compensation. Therefore, the district court improperly resolved factual disputes in Defendants' favor and misinterpreted the nature of the relationship between Defendants and their drivers in finding that drivers' routes and rates were

---

[6] *See* Section IV.E., *supra*.

[7] (*See* Mills Decl. ¶¶ 13-15 (A474-75); Hunt Dep. 36:9-10, 39:13-15(A705-706).)

established by a bidding process.  (SPA28 ("Plaintiffs were not 'assigned' work by

TXX, but rather bid for particular routes or areas.").)

Nor have Defendants produced any documentary evidence substantiating

their assertion that Plaintiffs bid and/or negotiated for routes.  The only

documentary evidence of bids that Defendants have provided is a single bid sheet

filled out by a non-Plaintiff, Laura Zamora, four months after the commencement

of this litigation and 20 days before Zamora signed a declaration for Defendants to

use in this litigation.[8]  Defendants have failed to submit any documentary evidence

showing that any Plaintiffs bid on any route, even though bid sheets would

certainly be in their possession, if they exist.  Defendants' failure to submit any bid

sheets that pre-date this litigation or any bid sheets from Plaintiffs, coupled with

Plaintiffs' declarants' testimony that they were unable to negotiate their rates of

pay,[9] further supports the inference that there was no true bidding process in place.

To the extent that the district court found to the contrary and accepted Defendants'

characterization of the bidding process, it usurped the role of the trier of fact by

resolving factual disputes, and it failed to make reasonable inferences in Plaintiffs'

favor.  *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 255 (2d Cir. 2002).

---

[8] (A642-43; A221.)

[9] (Dean Decl. ¶¶ 33-34 (A387); Morris Decl. ¶¶ 33-34 (A396); Thomas Decl. ¶¶ 37-38 (A407); Lewis Decl. ¶¶ 35-36 (A416-417); Sawhney Decl. ¶¶ 37-38 (A426).)

For example, while Plaintiffs have stated that they could not negotiate with Defendants, *see* n.9, *supra*, Defendants' driver-declarants stated that they did negotiate with Defendants.[10]  Thus, the parties dispute whether Plaintiffs (or other drivers) could meaningfully negotiate with Defendants.  Instead of recognizing this clear material factual dispute, the district court improperly sought to reconcile the conflicting evidence – and accepted Defendants' assertions that drivers could negotiate with TXX – by stating that Plaintiffs' declarants "do not . . . deny that other Drivers, such as the Non-Party Drivers, successfully negotiated rates or geographic areas."  (SPA14-15.)  At the summary judgment stage, Plaintiffs' evidence must be credited, which would mean either (1) Defendants' declarants' testimony regarding negotiations is untrue or (2) the experiences and opportunities of Defendants' driver-declarants were not the same as those of Plaintiffs, and therefore they are not relevant to a determination of whether *Plaintiffs* were employees or independent contractors.

The facts that (1) TXX rather than drivers prepared the invoices according to which TXX paid drivers[11] and (2) TXX often unilaterally reduced Plaintiffs' and

---

[10] (Gerlett Decl. ¶ 4 (A464); Gonzalez Decl. ¶ 4 (A122); Gualipa decl. ¶ 4 (A169); Zamora Decl. ¶ 4 (A207).)

[11] (Hunt Dep. 111:25-112:7 (A724).)

23

other drivers' pay[12] are further evidence of TXX's control over drivers'

compensation.  Based on the totality of the evidence, a reasonable jury could find

that TXX controlled Plaintiffs' routes and compensation.

### 2. The district court erred by disregarding Plaintiffs' evidence that Defendants penalized drivers for refusing assignments

The district court wrongly stated that "there is no evidence here of penalties

being assessed against Plaintiffs for refusing an assignment." (SPA43.)  In fact,

Plaintiffs set forth evidence of threats and terminations for refusing or missing

work.[13]  These are exactly the types of facts that courts have found demonstrate

control and weigh in favor of employee status.  *E.g.*, *Scantland v. Jeffry Knight,*

*Inc.*, 721 F.3d 1308, 1313 (11th Cir. 2013) ("Plaintiffs would also receive a 'route'

detailing the current day's work orders, which were generally assigned in two-hour

timeslots.  Though Plaintiffs' 'Independent Contractor Service Agreements'

provided that they could 'decline any work assignments,' plaintiffs testified that

they could not reject a route or a work order within their route without threat of

termination or being refused work in the following days.  Thus, while a technician

might consider a specific route or work order unprofitable, . . . plaintiffs had no

---

[12] (Dean Decl. ¶ 37 (A388); Morris Decl. ¶ 37 (A396); Thomas Decl. ¶ 41 (A407); Lewis Decl. ¶ 39 (A417); Sawhney Decl. ¶ 41 (A426).)

[13] (Dean Decl. ¶¶ 12-13 (A384); Morris Decl. ¶ 12 (A393); Thomas Decl. ¶¶ 14-15 (A403-404); Lewis Decl. ¶¶ 11-12, 14-17 (A413-414); Sawhney Decl. ¶¶ 12-14 (A422).)

24

power to decline the assignment."); *see also Swinney v. AMcomm Telecomms., Inc.*, 30 F. Supp. 3d 629, 640 (E.D. Mich. 2014) ("If defendant compelled the meetings, threatened termination, and backcharged for absences, the Court would be more inclined to find that plaintiffs and defendants had an employee-employer relationship.").  The district court therefore erred in giving Defendants' termination threats and the actual terminations of drivers Lewis and Sawhney no weight. (SPA35 (finding that "TXX's decision to cease doing business with Lewis' company, and indeed with any of the Plaintiffs, . . . does not, in and of itself, require the Court to determine that Plaintiffs were employees, or create a question of material fact as to this issue")).

The district court also mistakenly concluded that any penalties or terminations that did occur were merely an exercise of Defendants' rights under the independent contractor agreements and, thus, not an exercise of control.  (*Id.*). This conclusion inherently neutralizes the value of the control factor in determining whether an individual is an employee or independent contractor.  The correct analysis is to first evaluate the degree of control that the putative employer has over the putative employee.  Sufficient control then weighs in favor of finding the individual to be an employee.  *See Scantland*, 721 F.3d at 1313.  However, the district court's analysis allows one to first assume that the individual is an independent contractor and then decide that the level of control is consistent with

25

independent contractor status. This renders the control factor meaningless. If, as Plaintiffs' allege, Defendants have the power to end their working relationship with a driver if the driver refuses an assignment, they have significant control over that driver, and this strongly favors finding that the driver is an employee.

### 3. The district court erred in disregarding TXX's control over the relationship with TXX's client

In analyzing the control factor, the district court improperly failed to consider Plaintiffs' evidence of TXX's exclusive control over the relationship with its customers. (SPA32-35 (in discussion of control factor, failing to address TXX's exclusive control over the customer relationship).) Plaintiffs and Plaintiffs' declarants all stated that they had no independent relationship with TXX's customers.[14] Rather, TXX had complete control of the client relationship that formed the basis of drivers' income.[15] This is similar to *Superior Care*, where the workers "depended entirely on referrals to find job assignments." *Superior Care*, 840 F.2d at 1060. In other words, drivers were completely economically dependent on TXX, as opposed to being in business for themselves and merely

---

[14] (Dean Decl. ¶¶ 30-32 (A387); Morris Decl. ¶¶ 30-32 (A396); Thomas Decl. ¶¶ 33-36 (A406-407); Lewis Decl. ¶¶ 32-34 (A416); Sawhney Decl. ¶¶ 32, 34-36 (A425-426).)

[15] To the extent that Defendants' declarants testified, contrary to Plaintiffs' declarants, that they had a direct relationship with TXX's customers, there is a factual dispute that cannot be resolved on summary judgment. *Kaytor*, 609 F.3d at 545.

contracting with TXX on a "per job" basis. *Solis v. Kansas City Transp. Group*, No. 10-0887-CV, 2012 U.S. Dist. LEXIS 122047, at *26-27 (W.D. Mo. Aug. 28, 2012). This goes to the heart of the question of whether they "depend upon someone else's business for the opportunity to render service or are in business for themselves" and, accordingly, weighs strongly in favor of finding Plaintiffs to be employees. *Superior Care*, 840 F.2d at 1059.

### 4. The district court erred in finding that Plaintiffs could freely outsource work

The district court concluded that "each Plaintiff could make the deliveries himself or outsource the deliveries to another Driver without TXX approval." (SPA32.) In so doing, the district court improperly resolved a factual dispute. Plaintiffs dispute Defendants' contention that they were free to outsource their deliveries to other drivers. Plaintiffs' declarants expressly stated that as a matter of practice TXX had to approve any sharing of stops or routes, notwithstanding any language to the contrary in the independent contractor agreements.[16] *Mr. W*, 814 F.2d at 1047 (noting that it was what workers "actually *do* that is dispositive" of whether they are employees). This weighs strongly in favor of finding drivers to be employees. *See Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1102-1103 (9th Cir. 2014) ("Affinity retained ultimate discretion to approve or disapprove of those helpers and additional drivers. While the district court found that approval was

---

[16] (Dean Decl. ¶ 14 (A384); Lewis Decl. ¶ 8 (A414); Sawhney Decl. ¶ 15 (A423).)

largely based upon neutral factors, such as background checks required under federal regulations, it is still true that the drivers did not have an unrestricted right to choose these persons, which is an 'important right[] [that] would normally inure to a self-employed contractor.'") (alterations in original). In any event, "[o]ccasional exercise of the right to hire helpers also has not been found sufficiently indicative of independence to allow a finding of nonemployee status." *Usery v. Pilgrim Equip. Co., Inc.* ("*Pilgrim Equip.*"), 527 F.2d 1308, 1312 (5th Cir. 1976).

### 5. The district court erred in disregarding Plaintiffs' evidence that Defendants exercised control over their schedules

Plaintiffs presented evidence of several ways in which Defendants exercised control over drivers' schedules, which the district court improperly failed to credit. The district court mistakenly concluded that Defendants did not mandate an arrival time for drivers, even though Plaintiffs' declarants stated that Defendants did mandate an arrival time and punished drivers for tardiness by withholding work from late arriving drivers, making them wait for work on a standby basis, and/or fining them.[17] (SPA33 ("Whether Drivers were required to enter through one entrance prior to 5:45 a.m. or a different entrance requiring a sign-in after that time, it is undisputed that Drivers were physically present between 5:30 a.m. and

---

[17] (Dean Decl. ¶¶ 16-19 (A385); Morris Decl. ¶¶ 14-18 (A393-94); Thomas Decl. ¶¶ 17-20 (A404); Lewis Decl. ¶¶ 19-21 (A414); Sawhney Decl. ¶ 17 (A423).)

28

7:30 a.m. for the morning freight pick-up, a two-hour window, not a specific start time.").)  On summary judgment, Plaintiffs' evidence of a mandatory arrival time must be credited, and it weighs in favor of finding that drivers were employees. *See Ruiz*, 754 F.3d at 1097-1098, 1102 (fact that defendant required drivers to report to work at 6:00 a.m. or 6:30 a.m. weighed in favor of employee status); *Scantland*, 721 F.3d at 1313 (fact that plaintiffs were required to report to defendants' facility by 7:00 a.m. to 7:15 a.m. weighed in favor of employee status); *see also Artola v. MRC Express, Inc.*, No. 14 CV 23219, 2015 U.S. Dist. LEXIS 130183, at *21 (S.D. Fla. Sept. 25, 2015) ("Whether drivers had a fixed start time, and whether they risked losing their regular route(s) as a punishment for showing up late, is also a material dispute because it impacts drivers' ability to set their own schedules and operate independently of MRC."); *Swinney*, 30 F. Supp. 3d at 639 (fact that defendant set arrival time and penalized tardiness indicates control over putative class); *Bobbitt v. Broadband Interactive, Inc.*, No. 11 CV 2855, 2013 U.S. Dist. LEXIS 150854, at *7-8 (M.D. Fla. Oct. 21, 2013) (denying summary judgment motions where the parties disputed, *inter alia*, whether the defendant set the arrival time for the putative employees and punished putative employees for tardiness).

In fact, Plaintiffs' evidence shows that Defendants exercised substantial control over drivers' schedules and the timing of their deliveries.  The district court

did not give appropriate weight to Plaintiffs' contention that TXX did not allow drivers to leave its facility for several hours after arrival.[18] This "lockdown" period was an exercise of TXX's control over drivers' schedules. *See Scantland*, 721 F.3d at 1314 ("morning routine" mandated by defendants to be completed before beginning first job assignment and lasting up to two hours weighed in favor of employee status). Moreover, Plaintiffs' declarants stated that (1) TXX gave them their delivery schedules and (2) if they did not adhere to that schedule, a TXX representative reprimanded them.[19] Plaintiff Dean also stated that when he made a late delivery, TXX did not pay him for that stop.[20] That TXX penalized drivers for failing to adhere to their schedules is a strong indication of control.

The district court ignored entirely Plaintiffs' evidence that Defendants required drivers to get permission to take days off work.[21] (SPA32-35 (in discussion of control factor, failing to address requirement that drivers get permission to take days off).) This requirement further demonstrates Defendants'

---

[18] (Dean Decl. ¶ 20 (A385); Morris Decl. ¶ 19 (A384); Thomas Decl. ¶ 21 (A404); Lewis Decl. ¶ 22 (A414-415); Sawhney Decl. ¶ 18 (A425).)

[19] (Dean Decl. ¶¶ 21-23 (A385-86); Morris Decl. ¶¶ 21-23 (A394-95); Thomas Decl. ¶¶ 23-25 (A404-405); Sawhney Decl. ¶¶ 22-23 (A424).)

[20] (Dean Decl. ¶ 25 (A386).)

[21] (Dean Decl. ¶ 15 (A384); Morris Decl. ¶ 13 (A393); Thomas Decl. ¶ 16 (A404); Lewis Decl. ¶ 13 (A413); Sawhney Decl. ¶ 16 (A423).)

control over drivers' schedules.[22]  *See Scantland*, 721 F.3d at 1315 (finding

workers to be employees under FLSA where, *inter alia*, they had to "inform their

supervisors that they would be taking time off or request time off in advance");

*Artola*, 2015 U.S. Dist. LEXIS 130183, at *20 ("[T]hat drivers had to contact

MRC if they were running late or had to take a day off, weighs toward employee

status."); *see also Ruiz*, 754 F.3d at 1097; *Bobbitt*, 2013 U.S. Dist. LEXIS 150854,

at *10-11.  For the foregoing reasons, the district court erred in concluding as a

matter of law that TXX did not control drivers' schedules.

### 6. The district court erred in disregarding evidence that Defendants set rules drivers had to follow

The district court improperly failed to consider evidence that TXX set rules

that drivers were required to follow.  The district court recognized that "Notices to

All Independent Owner-Operators" purporting to be from six different customers

of TXX are "essentially identical[,]" but nonetheless credited Defendants'

assertion that the guidelines in those notices were in fact "developed by TXX's

Customers[.]"  (SPA15.)  However, it is reasonable to infer from the fact that the

---

[22] Of course, while exercising control over schedules is indicative of employee status, "flexibility in work schedules is common to many businesses and is not significant in and of itself."  *Snell*, 875 F.2d at 806; *see also Keller v. Miri Microsystems LLC*, 781 F.3d 799, 814 (6th Cir. 2015) ("[A] worker's ability to set his own hours and vacation schedule is not sufficient to negate control.") (internal quotation marks omitted); *Superior Care*, 840 F.2d at 1057, 1060 (where plaintiffs could decline proposed assignments for any reason, finding that control factor weighed in favor of employee status).

31

notices are "essentially identical" in both content and format that they were set not by TXX's customers, but by TXX itself. This inference is bolstered by the fact that the Notice for TXX customer Capital One – a bank – refers to "procedures regarding control [*sic*] substance handling[,]" even though as a bank Capital One would not require the transport of controlled substances.[23] The only logical reason for this reference to be included in Capital One's Notice is that the Notices were in fact created by Defendants, who included the controlled substances reference because many of their customers are pharmaceutical companies. As TXX's 30(b)(6) witness did not know who created the Notices,[24] additional light could have been shed on this question had the district court not quashed Plaintiffs' third party subpoenas and instead permitted Plaintiffs to depose one of TXX's customers.

Defendants also set requirements relating to drivers' vehicles.[25] The district court erred by failing to give any weight to this evidence, as Defendants' vehicle requirements are a clear exercise of control over drivers. *See Slayman v. FedEx Ground Package Sys.*, 765 F.3d 1033, 1043 (9th Cir. 2014).

---

[23] (A596.)

[24] (Hunt Dep. 49:12-18 (A708).)

[25] (Dean Decl. ¶ 8 (A394); Morris Decl. ¶¶8, 47 (A393, A398); Thomas Decl. ¶¶ 10, 5 (A403, A409); Lewis Decl. ¶ 8 (A413); Sawhney Decl. ¶ 8 (A422).)

### 7.  The district court erred in failing to credit evidence that drivers were subject to supervision and monitoring by Defendants

There are factual disputes regarding the level of supervision and monitoring to which Plaintiffs were subject.  For example, Plaintiffs' declarants stated that TXX's dispatcher or floor manager – not TXX's customers – called to reprimand them when they did not make deliveries on time or in the proper order,[26] while Defendants' declarants stated that they "maintain direct contact with representatives of each customer."[27]  The parties also dispute whether Defendants prohibited Plaintiffs from taking breaks and whether Defendants monitored drivers' movements via GPS.[28]  These factual disputes cannot be resolved on a summary judgment motion.  In addition, Plaintiffs' declarants stated – and Defendants have not disputed – that drivers were required to call TXX at the end of the day to confirm that they completed their deliveries.[29]  *See Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1223 (D. Kan. 2008) (finding that requirement

---

[26] (Dean Decl. ¶ 32 (A387); Thomas Decl. ¶¶ 35-36 (A406-407); Morris Decl. ¶ 32 (A396); Lewis Decl. ¶ 34 (A416); Sawhney Decl. ¶¶ 32, 363 (A425-26).)

[27] (Gerlett Decl. ¶ 27 (A73); Gonzalez Decl. ¶ 23 (A130); Gualipa Decl. ¶ 23 (A176); Zamora Decl. ¶ 29 (A216).)

[28] (*Compare* Morris Decl. ¶ 24 (A395); Thomas Decl. ¶ 26 (A405); Lewis Decl. ¶ 30 (A416), *with* Hunt Dep. 56:5-21 (A710).)

[29] (Dean Decl. ¶ 28 (A386); Morris Decl. ¶ 28 (A395); Thomas Decl. ¶ 30 (A405-406); Lewis Decl. ¶ 28 (A415); Sawhney Decl. ¶ 28 (A425).)

that driver return to office to check out at end of shift was part of a "regimented arrangement" weighing in favor of finding him to be an employee). Based on Plaintiffs' evidence, a jury could reasonably find that drivers were subject to supervision and monitoring by Defendants with respect to the manner and means of their work. Accordingly, the record supports the conclusion that Defendants actively supervised and monitored drivers during their workdays, and the district court erred in finding to the contrary. *See Ruiz*, 754 F.3d at 1102.

The district court sought to minimize certain indicia of Defendants' control over drivers by noting that "constraints" resulting from government regulations concerning the transport of controlled substances "are dictated by the nature of TXX's business." (SPA33.) However, the pertinent question is not *why* a putative employer exercised control over putative employees, but merely *whether* it did so. *Scantland*, 721 F.3d at 1316 ("The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control. Business needs cannot immunize employers from the FLSA's requirements. If the nature of a business requires a company to exert control over workers to the extent that Knight has allegedly done, then that company must hire employees, not independent contractors."). Thus, where "[t]he demands of the business controlled the" putative employees, that weighs in favor of finding that they were employees under the economic reality test. *Snell*, 875

34

F.2d at 806; *see also* Admin. Interpretation 2015-1 at 13-14 ("Some employers assert that the control that they exercise over workers is due to the nature of their business, regulatory requirements, or the desire to ensure that their customers are satisfied. However, control exercised over a worker, even for any or all of those reasons, still indicates that the worker is an employee."). To be sure, this Court has recognized that supervision to ensure regulatory compliance is a type of control that weighs in favor of employee status. *Barfield*, 537 F.3d at 147 (finding that control factor weighed in favor of an employer-employee relationship where, *inter alia*, "because both federal and New York law required [the hospital] to adhere to certain minimum standards of patient care, it supervised the care afforded by agency employees at least to this extent"); *Superior Care*, 840 F.2d at 1057, 1060 (defendant's review of patient notes kept pursuant to state and federal law weighed in favor of employee status); *see also Gayle v. Harry's Nurses Registry, Inc.*, No. CV-07-4672, 2009 U.S. Dist. LEXIS 17768, at *22 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 Fed. Appx. 714 (2d Cir. 2014) ("[T]he fact that defendants do not profess an interest in monitoring the nurses' work but require them to prepare paperwork in order to comply with government regulations does not change the result, which is that defendants do supervise field nurses' work, thereby enabling them to control that work.").

35

Based on the foregoing, a reasonable jury could find that the control factor weighs in favor of finding Plaintiffs to be employees because Defendants (1) exercised control over their routes, compensation, and schedules; (2) penalized drivers for refusing assignments; (3) exercised control over who performed work; (4) maintained exclusive control over the customer relationship; and (5) set rules that drivers had to follow.

**b. The district court erred in finding that the opportunity for profit or loss weighed in favor of independent contractor status**

"In considering whether a worker has an opportunity for profit or loss, the focus is whether the worker's managerial skill can affect his or her profit and loss." Admin. Interpretation No. 2015-1 at 7. The district court found that the opportunity for profit and loss and investment in the business weighed "substantially" in favor of independent contractor status primarily because drivers were free to work for other businesses and hire helpers. (SPA35-36.) Those factual conclusions mistakenly relied on Defendants' self-serving written materials instead of looking at the realities of the nature of drivers' work and improperly resolved material factual disputes in Defendants' favor.

1. **The district court gave insufficient weight to the exclusive nature of the relationship between Plaintiffs and TXX**

"[I]n determining whether an individual's degree of opportunity for profit or loss is indicative of employee or independent-contractor status, courts should take into account whether the business relationship had an exclusive nature that limited the purported employee's opportunity for profit from other sources of work." *Kinney v. Artist & Brand Agency LLC*, No. 13 CV 8864, 2015 U.S. Dist. LEXIS 160465, at *52 (S.D.N.Y. Nov. 25, 2015) (Report & Recommendation). Plaintiffs have proffered evidence that as a practical reality, they could not and did not work for anyone other than TXX,[30] further diminishing their opportunity for profit or loss. *Lewis*, 554 F. Supp. 2d at 1224 ("Even if plaintiff was hypothetically able to profit by making extra deliveries, the record contains evidence that ASAP prevented him from accepting deliveries outside of his assigned route, which effectively denied plaintiff whatever independent opportunity he might have had for profit or loss."). Crucially, "[f]or purposes of employment status under the FLSA, the mere opportunity to accept additional employment is not material; as a matter of economic reality, the outside work which plaintiff actually performs is dispositive." *Id.* at 1223; *see also Snell*, 875 F.2d at 808 ("'It is not what the

---

[30] (Dean Decl. ¶¶ 9, 12-13 (A384, A386); Thomas Decl. ¶¶ 7, 14-15, 32 (A402-404, A406); *see also* Morris Decl. ¶¶ 12, 29, 30 (A393, 395-96); Lewis Decl. ¶¶ 11-12, 29, 32 (A413, A416); Sawhney Decl. ¶¶ 12-13, 29, 34 (A422, A425-26).)

[workers] *could* do that counts, but as a matter of economic reality what they actually *do* that is dispositive.'").  Accordingly, the facts that no written policy prohibited drivers from engaging in other work and Defendants' self-serving independent contractor agreements nominally allowed drivers to engage in other work are irrelevant, and the district court's finding to the contrary was mistaken. (SPA36 (emphasizing the lack of any "prohibition on Drivers providing services to other businesses in addition to TXX").)

Instead, the district court should have given significant weight to the *de facto* exclusive relationship that Plaintiffs had with TXX.  Plaintiffs worked exclusively and on a more than full time basis for Defendants.  Moreover, as Plaintiffs carried pharmaceutical products, they could not carry other cargo simultaneously and, therefore, work simultaneously for multiple companies.[31]  Accordingly, as a matter of economic reality drivers were economically dependent on Defendants for their livelihood and did not, as independent contractors do, have the opportunity to profit by offering their services to a variety of customers.[32]  *See Schwind v. EW &*

---

[31] (Thomas Decl. ¶ 7 (A402-403); A336-37, paragraph "FIFTEENTH.")

[32] Notably, under the economic reality test the reason why drivers worked exclusively for Defendants is irrelevant.  What matters is the fact that they were economically dependent on Defendants.  *See Lopez v. Silverman*, 14 F. Supp. 2d 405, 421 (S.D.N.Y. 1998) (applying economic reality test to determine whether joint employer relationship exists).

*Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) ("[B]ecause [plaintiff] worked only for [defendant], he was precluded from other income.").

### 2. The district court improperly failed to consider Defendants' control over pricing

Given the full-time nature of Plaintiffs' work for TXX, the requirements for drivers set by TXX and TXX's customers, and drivers' lack of involvement in negotiating the prices TXX's customers paid TXX for its services, drivers had little opportunity for profit and loss in the ways relevant to the economic reality test. "Generally, an independent contractor undertakes the risk of profit and loss usually associated with an independent business." *Lewis*, 554 F. Supp. 2d at 1223-24. Here, however, TXX paid drivers based on the number of stops they made.[33] This "is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces." *Scantland*, 721 F.3d at 1317. Moreover, drivers had no influence over the rates TXX's customers paid for delivery services.[34] This "suggest[s] that [drivers] acted as [] employee[s]." *Lewis*, 554 F. Supp. 2d at 1224; *see also Pilgrim Equip.*, 527 F.2d at 1313 (finding defendant's control over pricing weighed in favor of finding workers to be

---

[33] (Dean Decl. ¶ 33 (A387); Morris Decl. ¶ 33 (A396); Thomas Decl. ¶ 37 (A407); Lewis Decl. ¶ 35 (A416); Sawhney Decl. ¶ 37 (A426).)

[34] (Hunt Dep. 20:24-21:9 (A707).)

employees).  The district court erred in failing to consider this in analyzing the

opportunity for profit or loss factor.  (SPA35-36.)

### 3. The district court improperly disregarded issues of material fact regarding helpers

The district court's finding that drivers' ability to hire helpers weighed in

favor of finding that they had an opportunity for profit or loss was error.  (SPA35-

36.)  Plaintiffs' declarants stated that any helpers had to be approved by

Defendants, notwithstanding any self-serving language in Defendants' independent

contractor agreements to the contrary.[35]  Thus, their "ability to hire and manage

others was illusory." *Scantland*, 721 F.3d at 1315, 1317.  Indeed, courts have

found issues of fact regarding the opportunity for profit or loss where putative

employers exercised less control over helpers than Plaintiffs allege Defendants

exercised in this case.  *E.g.*, *Keller*, 781 F.3d at 813 (finding issue of fact regarding

opportunity for profit or loss where helpers did not contract with defendant but

defendant required helpers to adhere to defendant's customer's certification

requirement); *Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 450, 456

(S.D.N.Y. 2002) (finding factual dispute regarding plaintiff's opportunity for profit

or loss where plaintiff used his own tools, defendant provided certain work

supplies, defendant contended plaintiff's ability to hire helpers indicated

---

[35] (Dean Decl. ¶ 14 (A384); Lewis Decl. ¶ 18 (A414); Sawhney Decl. ¶ 15 (A423).)

opportunity for profit, and plaintiff testified that although helpers were not subject to defendant's approval, defendant preferred to meet prospective helpers).

Moreover, the ability to hire helpers does not necessarily indicate an opportunity for profit. Under similar facts, the Sixth Circuit recently found material factual disputes regarding a plaintiff's opportunity for profit where the defendants asserted that the plaintiff could have taken more assignments by hiring assistants. The Sixth Circuit noted "that hiring employees carries additional costs that would have affected [the plaintiff's] ability to earn a greater profit. Wages, vehicles, gas, tools, and computers – these are just a few of the additional expenses [the plaintiff] would have accrued had he hired assistants to increase the number of installations he could perform every day." *Keller*, 781 F.3d at 812.

### 4. The district court erred by failing to consider the comparative investments of Plaintiffs and Defendants in evaluating Plaintiffs' opportunity for profit or loss

The district court erred in failing to consider the comparative investments of Defendants and drivers. *Mr. W*, 814 F.2d at 1051; *see also* Admin. Interpretation 2015-1 at 9 ("Courts also consider the nature and extent of the relative investments of the employer and the worker in determining whether the worker is an independent contractor in business for him or herself."). In fact, this consideration is entirely absent from the district court's decision. (SPA35-36.)

41

"As courts have noted, the 'investment,' which must be considered as a factor [in the economic reality test] is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Snell*, 875 F.2d at 810; *see also Lewis*, 554 F. Supp. 2d at 1224 ("The comparison of a worker's individual investment to the employer's investment in the overall operation helps to distinguish between employees and independent contractors."). Furthermore, it is appropriate to consider the relative investments of the parties in deciding whether this factor weighs in favor of finding the worker to be an employee. *Snell*, 875 F.2d at 810-811; Admin. Interpretation 2015-1 at 9 ("Even if the worker has made an investment, it should not be considered in isolation; it is the relative investments that matter. . . . If the worker's investment is relatively minor, that suggests that the worker and the employer are not on similar footings and that the worker may be economically dependent on the employer."). Here, drivers paid for their vehicles, which they used for both work and personal purposes, and related expenses. This investment pales in comparison to Defendants' extensive investments in their business, including facilities and staff including dispatchers, sales staff, account coordinators, managers, and executives.[36] *Lewis*, 554 F. Supp. 2d at 1224.

---

[36] *See* Section IV.J., *supra*.

Moreover, "[i]n the context of delivery services, courts have rejected the notion that an individual's use of his personal vehicle renders him an independent contractor." *Id.*; *see also Keller*, 781 F.3d at 810 ("[T]here are inherently some capital investments that do not necessarily evidence economic independence. For example, investment of a vehicle is no small matter, but that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes.") (internal quotation marks and alterations omitted). In reviewing a summary judgment decision with similar facts, where the plaintiff drove a personal vehicle, used many of his own tools and various electronic devices to perform his work, the Sixth Circuit concluded that "the trier of fact should decide how [the plaintiff's] capital investments compared to [the defendant's], and whether [the plaintiff's] capital investments demonstrate that [he] was economically independent." *Keller*, 781 F.3d at 811.

### 5. The district court erred in failing to consider whether Plaintiffs faced any risk of loss

The district court failed to consider whether Plaintiffs faced any risk of loss. (SPA35-36.) This was error. Admin. Interpretation 2015-1 at 8. The district court identified no way in which Plaintiffs could have experienced a business loss, and in fact Plaintiffs could not. As set forth above, Plaintiffs did not make any substantial investments in their work that could be subject to a business loss. *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) (noting that without

43

making a meaningful investment in their work, workers "have no investment to lose"). To the extent that Plaintiffs' earnings could be reduced if they performed less work, "[a] reduction in money earned . . . is not a 'loss' sufficient to satisfy the criteria for independent contractor status." *Snell*, 875 F.2d at 810; *see also Pilgrim Equip.*, 527 F.2d at 1313 (finding no risk of loss where workers were paid a percentage of their locations' revenue and were responsible for losses from bad checks and theft).

For the foregoing reasons, a jury could find that Plaintiffs did not have an opportunity for profit and loss, and their investment in the business was relatively small. Accordingly, the district court erred in concluding that the opportunity for profit or loss "weighs substantially in favor of finding Plaintiffs to be independent contractors." (SPA36.)

### c. The district court erred in concluding that the degree of skill and initiative involved was essentially a neutral factor

The district court found that the degree of skill and initiative involved was a neutral factor. (SPA37.) This was error, as it was based on the erroneous finding that Plaintiffs exercised independent initiative. (*Id*.)

"A worker's business skills, judgment, and initiative, not his or her technical skills, will aid in determining whether the worker is economically independent." Admin. Interpretation 2015-1 at 10; s*ee also Keller*, 781 F.3d at 809 (noting that

44

the relevant consideration is "whether [plaintiff's] profits increased because of the initiative, judgment, or foresight of the typical independent contractor, or whether his work was more like piecework.") (internal quotation marks and alterations omitted).  The district properly found that drivers do not possess a specialized skill. (SPA36.)  To be sure, Defendants did not require that Plaintiffs have any relevant prior experience.[37]  *See Keller*, 781 F.3d at 809-810 (finding issue of fact regarding degree of skill factor where a worker's success did not "rise[] or fall[] on the worker's special skill[,]" and the plaintiff was not chosen "for assignments because he was particularly skillful").

The district court erred, however, in finding that Defendants' drivers exercised independent initiative because they bid on jobs and could acquire additional vehicles and/or use helpers.  (SPA37.)  As discussed *supra* Section VI.B.ii.a.1, Plaintiffs dispute that a true bidding system was in place; rather, Defendants controlled work assignments and compensation.  Similarly, as set forth in Section VI.B.ii.a.4, *supra*, the parties dispute the degree to which Defendants exercised control over the hiring of helpers.  Thus, there are material factual disputes relevant to this factor, and a jury could find that it weighs in favor of finding Plaintiffs to be employees.  As such, the district court erred in concluding

---

[37] *See* Section IV.B., *supra*.

45

that this factor "does not weigh strongly in either direction." (SPA37 (internal quotation marks omitted).)

### d. The district court erred in lessening the weight of the integral nature of Plaintiffs' work to Defendants' business based on the replaceable nature of drivers

The district court correctly found that drivers' work was integral to Defendants' business. (SPA38.) Indeed, without the drivers Defendants would have no revenue, as they would be unable to meet their "obligation to get [customers'] freight delivered."[38] However, the district court erred in lessening the significance of this factor because drivers were easily replaceable. (*Id*.) When an individual's work is integral to a putative employer's business, that supports a finding that he is an employee, regardless of whether he is easily replaceable. *See*, *e.g.*, *Dixon v. Zabka*, No. 11 CV 982, 2014 U.S. Dist. LEXIS 159692, at *73-74 (D. Conn. Nov. 13, 2014) (finding that this factor weighed in favor of employee status even where defendants argued that the workers' work was "interchangeable and easily replaceable"). To be sure, "[t]he policy behind the 'suffer or permit' statutory language was to bring within the scope of employment workers integrated into an employer's business. If the work performed by a worker is integral to the employer's business, it is more likely that the worker is economically dependent on the employer." Admin. Interpretation 2015-1 at 6.

---

[38] (Hunt Dep. 23:3-8 (A702).)

46

There is no logical reason to lessen the weight of this factor based on the putative employee's replaceability, which is simply "not the relevant test." *Bobbitt*, 2013 U.S. Dist. LEXIS 150854, at *32. Rather, the key question is whether the worker's "work constitute[s] an 'essential part' of the alleged employer's business. . . . In other words, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." *Donovan v. Dialamerica Marketing, Inc.* ("*Dialamerica*"), 757 F.2d 1376, 1385 (3d Cir. 1985) (finding work of people who looked up phone numbers integral to a telemarketing company) (internal citation omitted); *see also Gayle*, 2009 U.S. Dist. LEXIS 17768, at *27 ("The question is not whether plaintiff's individual services were essential to the business, but whether the type of work performed by plaintiff was integral to the defendants' business, which it clearly was."). Because TXX's drivers' work is integral to Defendants' business, this factor weighs heavily in favor of finding Plaintiffs to be Defendants' employees.

> **e. The district court erred in concluding that the permanence or duration of working relationship weighed in favor of independent contractor status**

As the DOL has explained,

Permanency or indefiniteness in the worker's relationship with the employer suggests that the worker is an employee. After all, a worker who is truly in business for him or herself will eschew a permanent or indefinite relationship with an employer and the dependence that comes with such permanence or indefiniteness.

Admin. Interpretation No. 2015-1 at 11-12 (noting that an independent contractor "typically works one project for an employer and does not necessarily work continuously or repeatedly for an employer"); *see also Keller*, 781 F.3d at 807 ("Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration.'") (citing *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998)).  Plaintiffs and Plaintiffs' declarants all worked for Defendants for years and on an exclusive basis.  The independent contractor agreements Plaintiffs signed were either silent about the duration of the agreements[39] or were automatically renewable and were in fact regularly renewed.[40]  The permanence and duration of the working relationship therefore weighs in favor of finding Plaintiffs to be employees.  *See Scantland*, 721 F.3d at 1318; *Dialamerica*, 757 F.2d at 1385 ("[T]he home researchers did not transfer their services from place to place, as do independent contractors. Each worked continuously for the defendant, and many did so for long periods of time.

---

[39] (A300-302 (Plaintiff Dean); A316-323 (Plaintiff Dean); A297-98 (Plaintiff Thomas); A306-312 (Plaintiff Thomas).)

[40] (A337, paragraph "NINTEENTH" [*sic*]; A328, paragraph "NINTEENTH" [*sic*].)

As such, the permanence-of-working-relationship factor indicates that the home researchers were 'employees' of the defendant.") (internal citation omitted).

The district court nonetheless concluded that this factor weighs in favor of independent contractor status because one version of the independent contractor agreements was for renewable 90 day terms, was terminable on ten days notice at the end of the term, and was non-exclusive. (SPA37.) This analysis improperly ignored the economic reality of Plaintiffs' relationship with Defendants, *i.e.*, that Plaintiffs in fact had a longstanding, indefinite, and exclusive working relationship with Defendants. *Cf. Keller*, 781 F.3d at 808 (reversing grant of summary judgment in employer's favor where, *inter alia*, there was "a genuine dispute about whether [the parties] had a de facto exclusive relationship"). The district court clearly erred by placing primary importance on the terms of one version of the contract rather than the reality of the relationship between Plaintiffs and Defendants. If self-serving contracts drafted by putative employers were given substantial weight in the economic reality analysis, putative employers would be free to distort that analysis by drafting and requiring putative employees to sign self-serving contracts. *Cf. Superior Care*, 840 F.2d at 1059 ("[A]n employer's self-serving label of workers as independent contractors is not controlling[.]").

Finally, to the extent that Plaintiffs' description of actual events differs from the provisions of the independent contractor agreements, this, at most, creates an

49

issue of fact about the economic realities of the relationship between drivers and TXX. Any disputes regarding the permanence and exclusivity of Plaintiffs' relationship with Defendants must, of course, be resolved by the factfinder, not by a judge on a summary judgment motion. *Lucente*, 310 F.3d at 255. The empty words in the contract – again, a self-serving document drafted by Defendants – cannot override the realities of the working relationship between Defendants and their drivers. *See Scantland*, 721 F.3d at 1317; *see also Keller*, 781 F.3d at 808 (noting that "[t]he FLSA is designed to defeat rather than implement contractual arrangements") (internal quotation marks omitted). Accordingly, the permanence and duration of the working relationship weighs in favor of finding Plaintiffs to be employees.

### f. Under the totality of the circumstances, a jury could find that Plaintiffs were employees under the FLSA

As set forth above, resolving factual disputes and making all reasonable inferences in Plaintiffs' favor, a reasonable jury could find that every factor in the economic reality test weighs in favor of finding Plaintiffs to be employees. The record supports finding that Defendants exercised extensive control over drivers, including who worked, when they worked, what work they performed, and how they performed it. They were economically dependent on Defendants and did not have the opportunity for profit or loss that an independent contractor does. Nor did their work require any special skills. The drivers' work *was* TXX's business –

50

without the drivers, TXX would have no revenue.  Finally, Plaintiffs worked for

Defendants on a long term and exclusive basis.  Thus, a reasonable jury could

conclude that under the totality of the circumstances, Plaintiffs were TXX's

employees.  Therefore, Defendants' summary judgment motion should have been

denied with respect to Plaintiffs' FLSA claims.

### iii.  A reasonable jury could find that Plaintiffs were employees under New York law

Under the NYLL,

> the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results.  Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule.

*Bynog*, 1 N.Y.3d at 198 (internal citations omitted).  "These factors, however, are

not exhaustive: New York courts commonly consider additional factors."  *Hart v.*

*Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013).  Thus, a

court must consider all facts relevant to determining the degree of control

exercised by Defendants over drivers.  Moreover, while the standards for

determining whether an individual is an employee are somewhat different under

the FLSA and New York law, "there appears to have never been a case in which a

worker was held to be an employee for purposes of the FLSA but not the NYLL

(or vice versa)."  *Id*. at 924.

51

The district court's conclusion that Plaintiffs were independent contractors under New York law rested on essentially the same errors it made in its analysis under the FLSA. That is, the district court improperly resolved factual disputes in Defendants' favor and disregarded much of Plaintiffs' evidence.

### a. A reasonable jury could find that Plaintiffs did not work at their own convenience

As discussed *supra* Sections VI.B.ii.a.2./4./5., Plaintiffs have set forth evidence that they did not work at their own convenience. Rather, Defendants set start times, penalized drivers for arriving late or missing work, did not permit drivers to leave TXX's facility until a certain time, and did not permit drivers to take breaks. *See Lewis*, 554 F. Supp. 2d at 1223 ("Because SAAP would have terminated plaintiff if he had missed more than one day of work, plaintiff was not free to come and go as he pleased."). In addition, drivers had to get Defendants' permission to miss a day of work and approval for helpers. To the extent that the district court found to the contrary, it improperly resolved factual disputes in Defendants' favor and disregarded Plaintiffs' evidence, as set forth in Sections VI.B.ii.a.4./5., *supra*. Thus, a reasonable jury could find that this factor weighs in favor of finding Plaintiffs to be employees.

### b. A reasonable jury could find that Plaintiffs were not free to engage in other employment

As set forth *supra* Section VI.B.ii.b.1., although drivers were not prohibited from working for other companies, as a practical matter they could not do so. The district court's conclusion that the freedom to engage in other employment factor weighed in favor of independent contractor status was therefore improper. (SPA43.) *See Anikushina v. Moodie*, 58 A.D.3d 501, 501-502, 504 (N.Y. App. Div. 1st Dep't 2009) (finding triable issue of fact regarding driver's employee status under New York law where driver performed deliveries solely for the putative employer, even though his contract permitted him to work for others); *Bermudez v. Ruiz*, 185 A.D.2d 212, 214 (N.Y. App. Div. 1st Dep't 1992) (finding triable issues of fact regarding driver's employee status under New York law where "[a]lthough it is alleged that [the driver] could perform work for other companies, it is undisputed that he continued to make deliveries exclusively for [the putative employer].").

The district court's emphasis on contractual terms rather than the reality that Plaintiffs worked full time and exclusively for Defendants improperly elevated form over substance. *Hart*, 967 F. Supp. 2d at 925 ("[E]mployee status under the NYLL turns on substance, not form."). This approach would permit employers to avoid liability under the New York Labor Law by carefully drafting contracts that do not accurately reflect the relationship with their employees. Therefore, a

53

reasonable jury could find that this factor weighs in favor of finding that Plaintiffs

were Defendants employees.[41]

### c. The fact that Defendants did not include Plaintiffs in their payroll or provide them with fringe benefits is not probative

It is undisputed that Defendants did not provide drivers with benefits or put

them on payroll.  However, Defendants' unilateral decision to do this makes these

factors "unimportant."  *Id*.  Drivers did not receive benefits and were not on

payroll because Defendants

> treated them as independent contractors.  To assign this factor much
> weight would effectively allow any employer to control, under New
> York law, a worker's status simply by labeling her an independent
> contractor and denying her employee benefits.  But employee status
> under the NYLL turns on substance, not form.

*Id*.  Therefore, these factors should not be given any weight in the employer-

employee analysis, and the district court erred in relying on these factors in

concluding that Plaintiffs were independent contractors under the NYLL.  *Cf.*

*Anikushina*, 58 A.D.3d 501 (finding triable issues of fact regarding employee

status where putative employee did not receive employee benefits, and his

---

[41] Even if the district court's conclusion that drivers were free to engage in other
employment were correct (which it is not), Plaintiffs note that such a finding
should not be heavily weighted, as "[m]any workers who are undeniably
employees under NYLL, such as waiters or bartenders, are free to carry second
jobs."  *Hart*, 967 F. Supp. 2d at 925.

54

compensation was reported on an IRS Form 1099 and was not subject to payroll

tax withholdings).

### d. A reasonable jury could find that Plaintiffs worked a fixed schedule

Plaintiffs' declarants have described working the same routes – and thus the

same schedules – for years.[42]  They were also required to arrive between 5:30 a.m.

and 5:45 a.m.[43]  Deviations from those schedules resulted in punishment or threats

of punishment.[44]  As such, drivers effectively had fixed schedules, and this factor

weighs in favor of finding Plaintiffs to be employees.

### e. A reasonable jury could find that Defendants exercised sufficient control over Plaintiffs to render Plaintiffs employees

Considering the totality of Plaintiffs evidence, a jury could find that

Defendants exercised sufficient control over Plaintiffs to render Plaintiffs

employees.  The factual disputes in this case are similar to those in cases where

New York courts have found triable issues of fact regarding employee status.  In

*Bermudez v. Ruiz*, 185 A.D.2d 212, a delivery driver (1) owned his vehicle and

---

[42] (Dean Decl. ¶¶ 3, 25 (A383, A386); Morris Decl. ¶¶ 3, 25 (A392, A395); Thomas Decl. ¶¶ 3, 27 (A402, A405); Lewis Decl. ¶¶ 3, 26 (A412, A415); Sawhney Decl. ¶¶ 3, 25 (A421, A424).)

[43] (Dean Decl. ¶¶ 16-17 (A385); Morris Decl. ¶¶ 14-15 (A393-94); Thomas Decl. ¶¶ 17-18 (A404); Lewis Decl. ¶¶ 19-20 (A414); Sawhney Decl. ¶ 17 (A423).)

[44] (Dean Decl. ¶¶ 21-23, 25 (A385-86); Morris Decl. ¶¶ 21-23 (A394-95); Thomas Decl. ¶¶ 23-25 (A404-405); Sawhney Decl. ¶¶ 22-23 (A424).)

55

paid for related expenses; (2) hired a helper; (3) decided the time and manner of delivery; (4) was paid based on the number and type of pieces of furniture he delivered; and (5) no payroll tax withholdings were taken from his pay. *Id*. at 213. The Appellate Division, First Department nonetheless found triable issues of fact regarding the driver's employment status because (1) the driver worked exclusively for the putative employer, although the putative employer contended the driver was free to work for others; (2) the putative employer arranged delivery dates with its customers; (3) a warehouse manager gave drivers a list of deliveries to be made each day; and (4) in making deliveries, the driver used paperwork that was provided by the putative employer.[45] *Id*. at 214.

In *Anikushina v. Moodie*, 58 A.D.3d 501, the Appellate Division, First Department again found triable issues of fact where, *inter alia*, (1) a delivery driver worked pursuant to an "independent contractor's agreement" that did not bar him from working for other companies; (2) the driver in fact worked solely for the putative employer; (3) the driver used forms provided by the putative employer; (4) the putative employer told the driver when to make pick-ups and deliveries; (5) the putative employer kept track of the driver's movements through use of a schedule and communications with dispatchers; (6) the driver was paid on a commission basis; (7) the driver's contract required him to carry a certain amount

---

[45] There was also a dispute as to whether the driver signed an independent contractor agreement. *Bermudez*, 185 A.D.2d at 214.

of insurance; (8) the driver wore a shirt bearing the putative employer's logo, although he was not required to do so; (9) the driver owned his vehicle and paid for related expenses; (10) the driver was free to decline work and hire helpers; (11) the driver did not receive fringe benefits, and he was not on the putative employer's payroll; and (12) the putative employer did not dictate the route that the driver took. *Id*. at 501-502, 504-505.

Similarly, in this case Plaintiffs worked exclusively for Defendants, received their delivery schedules from Defendants, and communicated with Defendants during and at the end of their shifts. This alone is sufficient under *Bermudez* and *Anikushina* to create triable issues of fact regarding Plaintiffs' employment status. Nonetheless, as set forth above, Plaintiffs have set forth additional ways – beyond the *Bynog* factors – in which Defendants exercised substantial control over driver. Specifically, as discussed *supra* Section VI.B.ii.a., Defendants (1) exercised control over drivers' routes and compensation; (2) penalized drivers for refusing assignments; (3) exercised control over who performed work; (4) maintained exclusive control over the customer relationship; and (5) set rules that drivers had to follow.

As there is sufficient evidence for a jury to conclude that Defendants' drivers were employees, the district court erred in granting Defendants' summary judgment motion with respect to Plaintiffs' NYLL claims.

57

## VII. CONCLUSION

For the foregoing reasons, the district court's order and judgment dismissing

the complaint should be reversed.


Dated:   New York, New York
         February 9, 2016

                                  /s/ Denise A. Schulman
                                  D. Maimon Kirschenbaum
                                  Denise A. Schulman
                                  **JOSEPH & KIRSCHENBAUM LLP**
                                  32 Broadway
                                  Suite 601
                                  New York, NY 10004
                                  212-688-5640

                                  *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 13,268 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated:   New York, New York
        February 9, 2016

<u>/s/ Denise A. Schulman</u>
Denise A. Schulman
**JOSEPH & KIRSCHENBAUM LLP**
32 Broadway
Suite 601
New York, NY 10004
212-688-5640

*Attorneys for Plaintiffs-Appellants*

# Special Appendix

# SPECIAL APPENDIX
## TABLE OF CONTENTS

PAGE

Order Granting Motion to Compel Plaintiffs to Withdraw Subpoenas, filed August 4, 2014.............................................................................SPA1

Order Denying Defendants' application for pre-motion conference, filed August 6, 2014.............................................................................SPA3

Report and Reccomendation by Hon. Steven I. Locke, filed May 22, 2015.....SPA5

Order by Hon. Sandra J. Feuerstein, filed September 30, 2015 ......................SPA45

Judgment, filed October 14, 2015....................................................................SPA50

Case 2:13-cv-02789-SJF-SIL Document 120 Filed 08/04/14 Page 11 of 21 PageID #: 928
Case 2:13-cv-02789-SJF-SIL Document 119 Filed 08/01/14 Page 1 of 2 PageID #: 919
SPA1



590 Madison Avenue, 20th Floor, New York, NY 10022-2524 ▪ p212 223-4000 ▪ f212 223-4134

Jeffrey W. Pagano
(212) 895-4208
jpagano@crowell.com

August 1, 2014

**VIA ECF**

The Honorable Sandra J. Feuerstein
United States District Judge
United States District Court for
    the Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★  AUG 04 2014  ★

LONG ISLAND OFFICE

> **Re:  Cecil Thomas et al. v. TXX Services, Inc. et al.**
> **U.S. District Court for the Eastern District of New York**
> **Civil Action No. 2:13-CV-02789-SJF-WDW**

Dear District Judge Feuerstein:

We represent Defendants TXX Services, Inc. ("TXX") and Patricia Hunt ("P. Hunt") (collectively, "Defendants") in connection with the above-referenced action. We write to provide additional information to supplement our letter to Your Honor dated July 28, 2014 [Docket No. 117], and seek additional relief as described below. Since we filed that letter, TXX has been informed that Plaintiffs served the subpoenas, which formed the basis of our letter, on Bellco and John Raschi.

In light of the Court's July 29, 2014 Order to Show Cause, we requested that Plaintiffs' counsel withdraw the subpoenas pending the Court's ruling. Ex. 1. Plaintiffs' counsel continues to refuse to withdraw the subpoenas. *Id.* We believe this refusal is inappropriate for three reasons. First, Plaintiffs are still not entitled to take the depositions or obtain the discovery they seek at this point. Second, Plaintiffs have yet to demonstrate any basis for seeking this discovery. Third, TXX, Bellco, and Mr. Raschi will have to spend time and money preparing for the depositions, even if the Court ultimately determines that the depositions are inappropriate, because Plaintiffs have noticed the depositions for August 8, 2014, a mere three days after the deadline for Plaintiffs to show cause.

Defendants respectfully request that the Court direct Plaintiffs to withdraw the two subpoenas, pending the Court's Order in this matter. Should the Court determine that Plaintiffs are entitled to any of the discovery they have requested in these subpoenas, such discovery should be obtained (if necessary) through new subpoenas with new dates for depositions that will allow the parties, Bellco, and Mr. Raschi sufficient time to prepare.

Case 2:13-cv-02789-SJF-SIL Document 119 Filed 08/01/14 Page 2 of 2 PageID #: 929
Case 2:13-cv-02789-SJF-SIL Document 119 Filed 08/01/14 Page 2 of 2 PageID #: 920
SPA2

The Honorable Sandra J. Feuerstein
August 1, 2014
Page 2

     We thank the Court in advance for its continued attention to this matter.

                    Respectfully submitted,

                    */s/ Jeffrey W. Pagano*

                    Jeffrey W. Pagano

Enclosure

cc (via ECF, with enclosure):     Douglas Weiner, Esq.
                                  JOSEPH & KIRSCHENBAUM LLP
                                  223 Broadway, 5th Floor
                                  New York, NY 10279
                                  facsimile: (212) 688-2548
                                  Counsel for Plaintiffs

Defendants' application is granted. Plaintiffs are to withdraw the subpoenas that are the subject of the Order to Show Cause. So Ordered.

s/ Sandra J. Feuerstein
U.S.D.J.    8/4/14

Case 2:13-cv-02789-SJF-SIL Document 128-9 Filed 08/06/14 Page 73 of 120 PageID #: 933
Case 2:13-cv-02789-SJF-SIL Document 117 Filed 07/28/14 Page 1 of 2 PageID #: 906
SPA3

590 Madison Avenue, 20th Floor, New York, NY 10022-2524 ▪ p212 223-4000 ▪ f212 223-4134



Jeffrey W. Pagano
(212) 895-4208
jpagano@crowell.com

July 28, 2014

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ AUG 06 2014 ★ 

**LONG ISLAND OFFICE**

**VIA ECF**

The Honorable Sandra J. Feuerstein
United States District Judge
United States District Court for
   the Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re:    **Cecil Thomas et al. v. TXX Services, Inc. et al.**
       **U.S. District Court for the Eastern District of New York**
       **Civil Action No. 2:13-CV-02789-SJF-WDW**

Dear District Judge Feuerstein:

      We represent Defendants TXX Services, Inc. ("TXX") and Patricia Hunt ("P. Hunt") (collectively, "Defendants") in connection with the above-referenced action. We write to respectfully request a pre-motion conference regarding deposition subpoenas that Plaintiffs' counsel has indicated will be served on Tuesday, July 29, 2014. Subject to the outcome of the pre-motion conference, Defendants intend to file a motion to quash these subpoenas.

      On June 24, 2014, the Court held a telephonic hearing regarding Magistrate Judge Wall's April 14, 2014 Report and Recommendation that Defendants' Motion for Judgment on the Pleadings be denied. During the hearing, Your Honor converted this motion to a motion for summary judgment and noted that additional summary judgment papers could be submitted to the Court. Your Honor asked whether additional information would be needed prior to filing such papers. Plaintiffs' counsel replied that he would like to take a Rule 30(b)(6) deposition. He also mentioned that he might want documents to be produced but, when pressed to identify which documents he would need for summary judgment, he did not respond. The Court ordered that Plaintiffs could take a Rule 30(b)(6) deposition and that any additional summary judgment papers were to be filed by August 6, 2014.[1] At no point did the Court grant either party permission to conduct, and Plaintiffs did not request, additional discovery from the Court.

---

[1] Defendants note that the Rule 30(b)(6) deposition was rescheduled by agreement of the parties, and the Court has since granted an extension of the deadline for summary judgment papers in light of the necessity to reschedule the Rule 30(b)(6) deposition. *See* July 21, 2014 Order (Dckt. No. 116).

Case 2:13-cv-02789-SJF-SIL Document 129 Filed 08/06/14 Page 24 of 121 PageID #: 934
Case 2:13-cv-02789-SJF-SIL Document 117 Filed 07/28/14 Page 2 of 2 PageID #: 907
SPA4

The Honorable Sandra J. Feuerstein
July 28, 2014
Page 2

On July 23, 2014, Plaintiffs' counsel sent us copies of two subpoenas, which he indicated would be served the following week. *See* Exs. 1 and 2. These subpoenas are directed at one of TXX's customers, Bellco, and John Raschi, the Director of Operations for AmerisourceBergen Corporation, Bellco's parent company. *Id.* We responded to Plaintiffs' counsel the same day by objecting to the subpoenas. *See* Ex. 3 (email). We have met and conferred with Plaintiffs' counsel, who refused to withdraw the subpoenas. Plaintiffs' counsel indicated, during the meet and confer session, that he would not serve the subpoenas until tomorrow, July 29, 2014.

The two deposition subpoenas are inappropriate for several reasons. First, and most important, the subpoenas are inconsistent with and in violation of Your Honor's instructions during the June 24, 2014 hearing. Plaintiffs' counsel did not request to take additional depositions other than the Rule 30(b)(6) deposition, and the Court rejected Plaintiffs' counsel's request for more expansive discovery at this time. Since the hearing, Plaintiffs have not made a request of the Court to allow any other deposition.

Second, in both subpoenas, Plaintiffs request the production of "Bellco's contracts with TXX Services, Inc. from 2007 to the present." *See* Exs. 1 and 2. This request is unnecessary and burdensome. Should Plaintiffs need such documents, they should have noted such a need at the hearing and issued requests for production of these documents from TXX, not from TXX's customers. The only purpose of these subpoenas is to harass and annoy TXX's customers, disrupting the business relationship between TXX and Bellco, and they should be quashed.

For the foregoing reasons, Defendants respectfully request that the Court schedule a pre-motion conference regarding the propriety of these subpoenas and the related depositions. Should the pre-motion conference fail to resolve the dispute, Defendants hereby state their intent to seek the Court's permission to file a motion to quash the subpoenas.

We thank the Court in advance for its attention to this matter.

Respectfully submitted,

*/s/ Jeffrey W. Pagano*

Jeffrey W. Pagano

Enclosures

cc (via ECF, with enclosures):     Douglas Weiner, Esq.
                                    JOSEPH & KIRSCHENBAUM LLP
                                    223 Broadway, 5th Floor
                                    New York, NY 10279
                                    facsimile: (212) 688-2548
                                    Counsel for Plaintiffs

Defendants' application for a pre-motion conference is denied. Upon consideration of plaintiffs' response to the Order to Show Cause dated 7/29/14, plaintiffs have not shown cause why they should be permitted to depose Bellco or Raschi. So Ordered. s/ Sandra J. Feuerstein
U.S.D.J.      8/6/14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
CECIL THOMAS and JOHN DEAN on
behalf of themselves and all others similarly
situated,

                                    Plaintiffs,

          -against-

TXX SERVICES, INC. and PATRICIA
DOUGAN HUNT,

                                    Defendants.
---------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 13-2789  (SJF) (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court on referral from District Judge Sandra J. Feuerstein is a motion for summary judgment filed by Defendants TXX Services, Inc. and Patricia Dougan Hunt (collectively "TXX" or "Defendants").  *See* Docket Entry ("DE") [131].  For the reasons set forth below, it is respectfully recommended that the motion be granted, and the case dismissed.

Plaintiffs Cecil Thomas and John Dean commenced this action against Defendants alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and New York State Labor Law, N.Y. Lab. Law §§ 190, *et seq.* ("NYLL").  Plaintiffs worked as delivery drivers delivering prescription medicines and other freight sent to TXX by its customers.  The complaint asserts four causes of action, a claim under the FLSA for failure to pay overtime, and three causes of action under New York Labor Law, for failure to pay overtime, N.Y. Lab. Law §§ 650, *et seq.*, "notice" violations, N.Y. Lab. Law §§ 195, 198, and unlawful deductions and untimely payment of wages, N.Y. Lab. Law §§ 191, 193.  Defendants claim that Plaintiffs were independent contractors, not employees, and thus are not entitled to relief under either the FLSA or NYLL.  In addition to relief as a collective action under the FLSA, Plaintiffs further bring their case as a class action under

Rule 23 of the Federal Rules of Civil Procedure.[1]

## BACKGROUND

Neither party has provided a statement of facts as required under Local Civil Rule 56.1. Accordingly, the facts below are culled from the declarations and exhibits submitted with the motion. *See generally Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) (noting that "while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record" (internal quotation and citation omitted)); *Gilani v. GNOC Corp.,* No. 04-CV-2935, 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (deciding summary judgment motion despite failure of either party to submit a 56.1 statement where testimony of individuals with personal knowledge of the events was provided, and both parties "had appropriate time to either brief the motion, or request additional discovery to substantiate their positions"). The entire factual record consists of the following: one transcript from the deposition of TXX's President John Hunt, DE [143-2]; two declarations from other TXX officials, DE [131-2] and [140]; four declarations from non-party delivery drivers in support of Defendants' motion, DE [131-7], [131-10], [131-12], and [131-14]; declarations from the named Plaintiffs, DE [133] and [137]; declarations from three other opt-in Plaintiffs in opposition to the motion DE [134], [135], and [136]; and various paper exhibits to the declarations.

## I. FACTUAL BACKGROUND

The parties do not use uniform definitions for the roles of the various players involved in TXX's business and in this case. Accordingly, the Court has established definitions for the purposes

---

[1]Approximately 68 additional individuals have submitted Consents to Sue Under Federal Fair Labor Standards Act. No motion for conditional certification of the collective action has been filed, nor was a motion for class certification pursuant to FED R. CIV. P. 23.

of this report and recommendation.

In general terms, Defendants' business model concerns the transportation and delivery of certain merchandise or freight, such as pharmaceuticals ("freight"). The manufacturer or other provider of the pharmaceuticals ("Customer" or "TXX's Customer") prepares its freight, contracts with TXX, a transportation company, to deliver that freight, and ships the freight by truck to TXX. TXX receives the freight from the Customer in a secure facility. Defendants engage delivery drivers who take the freight from TXX's facility and deliver it to its destination, typically a retail store ("Retailer").

Plaintiffs are current and former delivery drivers ("Drivers") that pick up the freight at TXX's facility and deliver it to the Retailers in accordance with instructions from TXX's Customers. As will be discussed in greater detail below, the individual Drivers also maintain business entities ("Driver-Corporations"), at TXX's insistence, and these Driver-Corporations enter into contracts with TXX.[2]

## A. TXX's Business

TXX is a licensed Property Broker of Transportation authorized to "engage in operations, in interstate or foreign commerce, as a broker, arranging for transportation of freight (except household goods) by motor carrier." Reply Declaration of Michael Mills ("Mills Decl."), Ex. A (U.S. Dep't of Transportation License), DE [140]. As set forth above, TXX contracts with its Customers to

---

[2]Given the contrary positions maintained by the parties regarding whether Plaintiffs were independent contractors or employees, they utilize different labels to refer to the role Plaintiffs played for TXX. Throughout their papers, Defendants refer to Plaintiffs and other drivers as "Vendors" or "Owner/Operators," emphasizing TXX's relationship with the Driver-Corporations and not the individual Drivers. Plaintiffs, however, minimize the role of the Driver-Corporations and refer to themselves as individual "Drivers."

provide delivery of the Customers' freight to their retail businesses or other Retailers. Deposition of John Hunt ("Hunt Dep.") at 23-24, Ex. A to Declaration of Douglas Weiner ("Weiner Decl."), DE [143-2]. The ownership of the freight remains with the Customer throughout the transportation. Hunt Dep. at 24. Once the freight reaches its destination at the Retailer, typically a retail pharmacy or store, TXX's responsibility ends. *See id.* at 25. In other words, TXX provides "a secure facility for the transference of narcotics and controlled substances" to both its Customers and Drivers. *Id.* at 108.

**B. The Agreements**

All Drivers who provide services to TXX are required to sign Owner/Operator Agreements (generally, the "Agreements") that designate them as independent contractors. TXX states that it will not do business with a Driver unless it executes an Agreement in the name of a Driver-Corporation. *See* Mills Decl. ¶ 25, DE [140]. The Drivers operate through a corporate entity or a d/b/a structure. *Id.* ¶ 28. TXX maintains that it never "engaged" individuals, but rather entered into the Agreements with the Driver-Corporations. For example Plaintiffs Thomas and Dean are not "engaged" by TXX to provide courier services; instead, TXX has engaged C & J Trucking ("C&J"), a "vendor business organization affiliated with Thomas," and JD's Inc. ("JD's"), a "vendor business organization affiliated with Dean." Declaration of Juan Baquero ("Baquero Decl.") ¶ 5, DE [131-2]. Plaintiffs claim that they were required to use a business name. *See* Declaration of John Dean ("Dean Decl.") ¶ 45, DE [133]; Declaration of Cecil Thomas ("Thomas Decl.") ¶ 49, DE [137].

The record before the Court includes copies of various Agreements for the named Plaintiffs, for those additional opt-in Plaintiffs who provided affidavits in opposition to Defendants' motion, and for four non-party drivers (collectively, the "Non-Party Drivers") who provided affidavits in

4

support of Defendants' motion.[3]  Although different forms were used throughout the years, the Agreements are substantially similar in many respects.

As demonstrated by a Business Certificate dated July 25, 1979, Plaintiff Thomas operates under the business name C&J,  Baquero Decl., Ex. A., and Plaintiff Dean executed a Business Certificate dated April 10, 2010 stating that he conducts business under the name JD's.  *Id.,* Ex. B. TXX has provided three Agreements pertaining to each Thomas and Dean.[4]  The Agreements concerning Thomas/C&J are dated April 30, 2004, December 15, 2007, and October 21, 2010, *id.,* Exs. C, E, and G, respectively, while those concerning Dean/JD's are dated July 30, 2007, May 1, 2008, and August 22, 2010.  *Id.,* Exs. D, F, and H, respectively.   TXX has also provided business cards for the business entities maintained by several of the Plaintiffs.  *See Id.,* Ex. L ("C&J Trucking" – Thomas); Mills Decl., Ex. U ("Artganic Musician" – Morris); Mills Decl., Ex. V ("DDL" – Lewis).

The earliest Agreements provided are titled "NICA" and "Independent Contractor Application and Agreement."[5]  With the exception of paragraph 2 pertaining to the amount of NICA

---

[3]In support of their motion, Defendants have provided declarations from four Drivers who are not parties to this action – John Gerlett ("Gerlett Decl."), DE [131-7], Sandra Gonzalez,  ("Gonzalez Decl."), DE [131-10], Edgar Gualipa,  ("Gualipa Decl."), DE [131-12], and Laura Zamora ("Zamora Decl."), DE [131-14].

[4]TXX has also provided the Business Certificates and Agreements in effect for the three opt-in Plaintiffs who submitted declarations in opposition to the motion, *see* Mills Decl. Exs. E, H, J, L, and M (Joseph Morris d/b/a "Artganic Musician"); G, I, K, O, P (Harpal Sawhney d/b/a "Sonia Enterprises"); F, N (Derek Lewis d/b/a "Derek Lewis"), and Agreements for the Non-Party Drivers.  *See* Gerlett Decl., Exs. A-C (d/b/a "Standard Transportation Services"); Gonzalez Decl. Ex. A (d/b/a "JANBC Services"); Gualipa Decl. Ex. A (d/b/a "Edgar G. Services Corp."); Zamora Decl., Exs. A-E (d/b/a "Scott Transportation Services, Inc." and "LZR").

[5]Prior to sometime in 2010, TXX had successive relationships with third party entities – including NICA and Contractor Associates of Northeast Incorporated – pursuant to which those entities, not TXX, paid the Drivers' invoices. Hunt Dep. at 133-35. Although the record is not clear, it appears as if these third party entities contracted directly with Plaintiffs regarding the provision of delivery services to TXX.

Affiliation fees owed, the two NICA Agreements are essentially identical. The Driver, referred to as the "Applicant," states that "he/she is an Independent Contractor" and that "he/she is not an employee of NICA or of the Contracting Company," which is identified in the application as TXX. *See* Baquero Decl. Ex. C and D (collectively "NICA IC Agreements").

The second set of Agreements, executed in late 2007 and mid-2008, consist of "Independent Driver Service Agreements" between Contractor Associates of the Northeast, Inc. ("CANE") and "Driver." *See* Baquero Decl. Ex. E and F (collectively "CANE IC Agreements"). In these Agreements, CANE agreed to "facilitate or locate on behalf of the Driver, companies that require the professional services of the Driver in fulfilling such companies' needs for transport or Courier Services." The Driver acknowledges that "he/she/it" is an independent contractor and not an employee of CANE or the "End User." While TXX is not mentioned expressly within the CANE IC Agreements, it is defined as "End User" in the Application and Enrollment forms also filled out by each Plaintiff. *See id.*

The most recent Agreements dated in September and October 2010, are expressly between TXX and the Driver-Corporations themselves, C&J and JD's. Baquero Decl. G and H ("IC Agreements"). The IC Agreements include many terms found in the NICA and CANE Agreements, including an express statement that each Driver is an independent contractor and that "no employer/employee relationship is created under this Agreement or otherwise as a result of its relationship between it and TXX or its Customers," that the Driver is not entitled to any benefits, that the Driver is solely responsible for filing of the Driver-Corporation's tax returns, and that the Driver must provide his own vehicle and is responsible for gas, tolls, repairs, and maintenance. IC Agreements ¶¶ FIFTH, EIGHTH. TXX offers to provide the Driver with Occupational Accident

Insurance, but further provides that the Driver may decline this offer, obtain his own insurance, and provide proof of insurance to TXX. IC Agreements ¶ SIXTH.

The IC Agreements also contain provisions that did not expressly appear in the earlier Agreements, but which further detail the rights and duties of the parties. For example:

- the Driver "has the right to employ, furnish and supervise qualified licensed drivers and other personnel as required in connection with the execution and performance of delivery assignments accepted" by the Driver. IC Agreements ¶ FOURTH.

- the Driver and its employees "are free to select their own routes and the order of their deliveries, taking into account the request of the customer and/or customer needs and deadlines." IC Agreements ¶ THIRTEENTH.

- TXX pays a fee based on a negotiated rate. IC Agreements ¶ FOURTEENTH.

- the Driver "has the right, in its sole discretion, to accept or reject assignments, from TXX, its customers, or any other carrier." IC Agreements ¶ FIFTEENTH.

- while the Driver may accept an assignment from another carrier, he must "check with the other carrier or TXX's customer to be certain that there are no legal restrictions or customer rules that would preclude [the Driver] from mixing product with the other carrier[']s product." IC Agreements ¶ FIFTEENTH.

The IC Agreement runs for 90-day renewable periods, and can be terminated without penalty by either party upon written notice served within ten days of the upcoming expiration date. IC Agreements ¶ NINETEENTH. Termination outside this period results in a $250 penalty. *Id.* TXX also has the right to terminate the agreement "upon the failure of the [Driver] to comply with any of its terms and conditions." *Id.*

Plaintiffs claim that they were required, under threat of having routes taken away, to sign a new contract "at least once each year." Dean Decl. ¶ 38; Thomas Decl. ¶ 43. Neither Plaintiff has

7

submitted any additional Agreements for the periods covered by the three Agreements discussed *supra,* or indeed for any time period.

The Drivers, including Plaintiffs, also executed a document entitled "Independent Owner-Operator Review" ("Review"). The Reviews, which are on TXX letterhead, were signed and witnessed around the same time that the IC Agreements were executed – Plaintiff Thomas's Review is dated October 21, 2010, *see* Baquero Decl., Ex. M, while Dean's Review is dated August 22, 2010. *Id.*, Ex. N. The Driver, referred to throughout this document as the "Owner-Operator," signs that he "acknowledges and agrees," to the contents of the Review, which consists of 20 paragraphs as follows:

1. The Owner-Operator [Driver] is a self-employed business owner or the sole owner of a [Driver-C]orporation of which he is an employee and provides his services as an Owner-Operator.

2. No federal, state or local income taxes or employment taxes are withheld from any payments made to the Owner-Operator by TXX and all such taxes shall be paid by the Owner-Operator.

3. The Owner-Operator is RESPONSIBLE for filing and paying all his own federal, state and local income tax[es] and employment taxes and all taxes for his helpers.

4. The Owner-Operator will receive an IRS Form 1099-Misc from TXX annually.

5. As an independent contractor, the Owner-Operator is NOT entitled to unemployment benefits or workman's compensation benefits and is responsible for providing and paying for his own insurance coverage.

6. As a business owner, the Owner-Operator is ENTITLED to file a Schedule C, Form 1040, in order to take advantage of certain business deductions offered to self-employed business owners.

7. The Owner-Operator is NOT required to perform services for a minimum or maximum number of hours per day or per week.

8

8.      The Owner-Operator sets his own hours of work and all work is done on a job-by-job basis.

9.      The Owner-Operator is paid a fixed amount or percentage for all services rendered as negotiated and agreed upon by both the Owner-Operator and TXX.

10.     The Owner-Operator is solely responsible for all expenses incurred in carrying out his business; including but not limited to (a) all costs of vehicle purchase; (b) repairs, (c) maintenance, (d) insurance, (e) fuel, (f) tolls and parking, (g) traffic violations and parking tickets, (h) helpers, (i) tinted windows and bars on windows, (j) security system, (k) cell phones, and (l) scanners, if required by customers.

11.     An Owner-Operator may accept or reject any work opportunities offered by TXX, without any reason.

12.     As an Independent Contractor, the Owner-Operator is encouraged to and is free to offer his services to others and perform services for more than one company at a time.

13.     The Owner-Operator is not required to wear any uniform advertising the business of TXX or its Customers, nor is the Owner-Operator required to advertise the business of TXX on their vehicle.

14.     TXX does not provide training to the Owner-Operator.

15.     TXX does not instruct or supervise how the Owner-Operator should make the delivery or routes to be used by the Owner-Operator.

16.     TXX will inform the Owner-Operator of any specific instructions or requests from Customers regarding when and where a delivery is to be made and any communications regarding delays in delivery.

17.     TXX does not dictate how the Owner-Operator is to perform a delivery. The Owner-Operator has the right to control the method and order of how transportation services are provided.

18.     The Owner-Operator will handle all complaints from the Customer regarding any delivery made by him.

19.     The Owner-Operator agrees to find a replacement to make deliveries if he is unable to complete them.

20. The Owner-Operator is not required to provide services personally and may hire assistants or helpers to complete the work, provided that they are properly licensed and insured. If the Owner-Operator hires a helper, assistant, etc., the Owner-Operator is solely responsible for paying for their services.

Baquero Decl., Exs. M, N (emphases in originals).

## C. Job Details

### *1. Bidding for Routes/Jobs*

The Drivers bid on a geographic area and the freight to be delivered within that area. Hunt Dep. at 36. A sample bid for a route previously held by opt-in Plaintiff Morris has been provided by TXX. *See* Mills Decl. ¶ 55. LZR Transportation submitted a Motor Carrier Bid, *see id.*, Ex. EE, which was accepted by TXX. Plaintiffs do not dispute that TXX allows any Driver to submit a bid.

Drivers are paid a single rate for each delivery stop, rather than by the hour. The IC Agreement provides for the opportunity to negotiate the rate for the stops, and the Drivers negotiate their contracts with Hunt, Mike Mills, and TXX's account coordinators. Hunt Dep. at 114. "Some [Drivers] are less aggressive in negotiations and choose to accept what is initially offered by TXX." Mills Decl. ¶ 18. The Non-Party Drivers declare that they personally negotiated both the scope of geographic area for deliveries, and the fees to be paid for each delivery. *See* Gerlett Decl. ¶ 4; Gonzalez Decl. ¶ 4; Gualipa Decl. ¶ 4; Zamora Decl. ¶ 4. Plaintiffs, however, claim that the right to negotiate is "illusory" and that they "have never had the opportunity to do so." Thomas Decl. ¶ 38; Dean Decl. ¶ 34; Declaration of Joseph Morris ("Morris Decl.") ¶ 34, DE [135]; Declaration of Derek Lewis ("Lewis Decl.") ¶ 36, DE [134]; Declaration of Harpal S. Sawhney ("Sawhney Decl.") ¶ 38, DE [136]. They do not, however, deny that other Drivers, such as the Non-Party Drivers,

10

successfully negotiated rates or geographic areas. Further, in apparent contradiction to their statements about the lack of an opportunity to negotiate, Plaintiffs state that "[w]hen I asked for more pay, I was told that they will find someone else to do the work." Thomas Decl. ¶ 38; Dean Decl. ¶ 34; Sawhney Decl. ¶ 38. None of the Plaintiffs provide any specifics regarding their purported attempts to negotiate their rates of pay.

### 2. Customer Notices

Drivers are presented with various "Notices to All Independent Owner-Operators" ("Notices") that are developed by TXX's Customers and set forth guidelines for the handling of the cargo "within the chosen secure transportation system and while on the premises of the Destination [Retailer]." Mills Decl. ¶ 47. According to the Notices, TXX's Customers include AmerisourceBergen, Bellco, Capital One, Cardinal Health, RDC, and HD Smith. Mills Decl., Ex. S & T.

The Notices are provided to, and acknowledged by the signature of, each Driver and witnessed by the HUB manager at TXX . Hunt Dep. at 43-44, 46; Baquero Decl., Ex. K. The Notices are essentially identical but for the name of the Customer, and are largely concerned with security procedures, such as keeping vehicle doors locked and being attentive to suspicious activities. They do contain a clause providing that "[i]n order to maintain a timely delivery schedule, all independent Owner-Operators must report to their pick up / drop off locations at the correct specified time and must follow manifest sequence / commit time created by" TXX's Customers. Baquero Decl., Ex. K.

### 3. Loading of the Freight

Trucks deliver freight from the Customers to the TXX facilities where it is unloaded by TXX

11

employees.  Hunt Dep. at 29-30.  The freight is then placed on a conveyer system in the TXX secure distribution area.  Mills Decl. ¶ 13.  According to Plaintiffs, prior to 2009 TXX had workers prepare cargo for delivery, but since then "each driver has [had] to organize and load cargo at the warehouse."  Thomas Decl. ¶ 22.   The merchandise is turned over and delivered the same day.  TXX does not store any merchandise.  Hunt Dep. at 30.

The Drivers may pick up merchandise starting at 5:45 in the morning.[6]  According to Hunt, Drivers need not arrive at specific times but may arrive at "[a]ny time of their choice" or "[t]hey could not arrive at all."  Hunt Dep. at 39.  Another TXX declarant, however, states that Drivers arrive at the facility between 5:30 a.m. and 7:30 a.m.  Mills Decl. ¶ 12.  A Driver arriving before 5:50 a.m. complies with a security check before entering.  *Id.*  That entrance is then locked down, and a Driver arriving after 5:50 a.m. "is required to enter the TXX location from a different entry point, which requires a different security check and process . . . including signing a security sheet noting the time of entry into the alternative security entry point.  *Id.*  Without reference to the alternative entrance, Plaintiffs essentially confirm this procedure, stating that they are "locked out" after 5:45 a.m. and must sign in.  Thomas Decl. ¶¶ 17-19; Dean Decl. ¶¶ 16-17, 19.

If a Driver does not show, the freight is put out to bid to other Driver-Corporations.  Hunt Dep. at 41.  Plaintiffs generally suggest that if a Driver is late, he could have stops taken from his route, be told to go home without work, or made to wait without pay as "standby."  Thomas Decl. ¶ 19.  TXX also states that an "untimely" or "tardy" Driver might not have the opportunity to provide delivery service that day, and that it is within the discretion of the "tardy" Driver "to remain in the

_____

[6]The testimony cited herein pertains to TXX's facility in Hauppauge only.  There are minor differences regarding TXX's other facilities in Carlstadt, New Jersey and Mount Laurel, New Jersey.  It is unclear whether Plaintiffs or opt-in Plaintiffs performed services commencing at either New Jersey facility.

secure premises to bid on, or agree to provide, alternate service to an alternative location assuming an alternative service opportunity arises." Mills Decl. ¶¶ 14-15.

The Driver who has successfully bid on a route receives a manifest or proof of delivery detailing the deliveries "to be made that day in the geographic area bid or selected." Mills Decl. ¶ 13. The Driver secures possession of the goods from a conveyor system or from a secured cage area. The Driver organizes the goods, referring to route numbers labeled on them, and loads them onto his vehicle for delivery. Hunt Dep. at 35-36. The Driver then signs the manifest or proof of delivery and is responsible for the merchandise. *Id.* at 31.

The IC Agreement also provides the Drivers with the right, in their sole discretion, to accept or reject assignments from TXX, *see* IC Agreements ¶ FIFTEENTH (a statement confirmed by the Non-Party Drivers). *See* Gonzalez Decl. ¶ 18; Gualipa Decl. ¶ 18; Zamora Decl. ¶ 24. Plaintiffs, without reference to any specific incident, claim that they were not allowed to turn down deliveries or shifts, and if they tried, they were threatened with having the route taken away. Thomas Decl. ¶ 14; Dean Decl. ¶ 12; Lewis Decl. ¶ 11; Morris Decl. ¶ 12; Sawhney Decl. ¶ 12. TXX says that Drivers that reject an assignment "may not receive alternative opportunities to provide service that day" unless there are additional "service opportunities beyond the ability of the other [Drivers] to bid or offer to provide the secure delivery service." Mills Decl. ¶ 15.

### *4. Delivery*

#### a. Route and Sequence of Deliveries

The IC Agreements provide that the Driver and his employees "are free to select their own routes and the order of their deliveries, taking into account the request of the customer and/or customer needs and deadlines." IC Agreements ¶ THIRTEENTH; *see also* Hunt Dep. at 42-43

(TXX does not set the sequence of delivery stops on the route and Drivers may negotiate directly

with the Retailers regarding delivery times). Hunt concedes that there is an estimated time of

departure from the TXX facility, but it is based on the Retailer's expectation of a delivery time,

which in turn is based on previous service to that Retailer. Hunt Dep. at 41-42. Drivers are to decide

"the time that the deliveries are picked up from the TXX facility, the times that the deliveries are

made to the designated recipients, and the time that the returns are made." *Id.* The Non-Party

Drivers similarly declare that, using the "time requirements of TXX's customers," they "route the

deliveries according to those time requirements or otherwise in the discretion of the person making

the deliveries." Gerlett Decl. ¶ 25; Gonzalez Decl. ¶ 21; Gualipa Decl. ¶ 21; Zamora Decl. ¶ 27.

In addition, the Drivers are free to change the "sequence of deliveries and perform deliveries in

whatever method and manner" they deem appropriate as long as security and recordkeeping

requirements are maintained. Gerlett Decl. ¶ 13; Gonzalez Decl. ¶ 11; Gualipa Decl. ¶ 11; Zamora

Decl. ¶ 15.

In contrast, Plaintiffs state that "[b]oth the schedule and route which I worked were assigned

to me by TXX and were not under my control. My schedule was determined by TXX. I was

required to make stops and deliver merchandise at the times scheduled by TXX to make the

deliveries." Dean Decl. ¶ 21; Lewis Decl. ¶ 23. One of the declarations provided by Plaintiffs,

however, is not in lockstep with the others. Opt-in Plaintiff Morris states that while the schedule is

set by TXX, "I can choose the best route to complete the delivery of cargo. I must meet the time

schedule required by TXX to make the deliveries." Morris Decl. ¶ 21. All Plaintiffs' declarations

claim that they were "reprimanded" by the dispatcher or floor manager for failing to make delivery

by a specified time or out of order. Thomas Decl. ¶ 25; Dean Decl. ¶ 23; Lewis Decl. ¶ 25; Morris

14

Decl. ¶ 23; Sawhney Decl. ¶ 23.

Although Plaintiffs claim that TXX set their schedules, they also acknowledge that the manifests, which are prepared by TXX's Customers and not TXX, detail both the cargo and the stops to be made.  Thomas Decl. ¶ 24; Dean Decl. ¶ 22.  As discussed *supra,* Customers do provide TXX with the Notices, or guidelines for the delivery of their freight, and these Notices contain a provision regarding the sequence and timing of deliveries.  *See* Mills Decl., Exs. S & T.   TXX does not, however, oversee the Drivers' compliance with the handling guidelines generated by its Customers.  Hunt Dep. at 55.

### b.  Conduct of the Drivers while on route

Some Plaintiffs claim, without reference to how or when, that they were monitored through GPS tracking.  Thomas Decl. ¶ 26; Lewis Decl. ¶ 30; Morris Decl. ¶ 24.   TXX asserts that after the freight leaves the its facility with the Driver, it is not tracked by GPS.  Hunt Dep. at 55-56.  Hunt does acknowledge that a radio system equipped with GPS was once used, it was discontinued "[m]ore than six years ago."  Hunt Dep. at 56.  TXX does not provide assurances to its Customers that the merchandise is being monitored while en route for delivery.  Hunt Dep. at 96.

Some Plaintiffs assert that TXX did not allow breaks during the workday.   Dean Decl. ¶ 29; *see also* Sawhney Decl. ¶ 20 ("I am diabetic and it is essential to my health that I eat meals on time bu[t] while working for TXX, I was not independent in deciding when to eat.  Many times I had to compromise my health by not taking a meal break").  The Non-Party Drivers, however, claim that they decide when, where, and how long to break for lunch, whether or not to take any stops for personal reasons, the nature of those stops and the duration of those stops.  Gerlett Decl. ¶ 26; Gonzalez Decl. ¶ 22; Gualipa Decl. ¶ 22; Zamora Decl. ¶ 28.

15

TXX acknowledges that upon prodding from its Customers or Retailers, TXX personnel may contact a Driver to determine the whereabouts of controlled substances, but that often, personnel from the Retailer will contact the Driver directly. Mills Decl. ¶ 17. The Non-Party Drivers confirm that they maintain direct contact with representatives of the Customer, and that the Retailers have cell phone numbers for the Drivers. Gerlett Decl. ¶ 27; Gonzalez Decl. ¶ 23; Gualipa Decl. ¶ 23; Zamora Decl. ¶ 29.

### c. Delivery to the Retailer

At the delivery point, the Retailer signs for receipt of the freight or merchandise. Some Retailers require signatures on paper, on a signature pad, or both. Hunt Dep. at 28-29. The Drivers use scanners to scan the bar codes on the merchandise. *Id.* at 29. Scanning verifies in real time the transfer of custody of the freight from the Driver to the Retailer. *Id.* at 57-58. From time to time, the Retailer gives the Driver merchandise that needs to be returned to TXX's Customer.

When there are problems with the delivery, either the Customer or the Retailer may complain to TXX directly. Mills Decl. ¶ 17. Citing their lack of a direct business relationship with TXX's Customers, Plaintiffs claim that they could not contact those Customers directly. Thomas Decl. ¶¶ 33-34; Dean Decl. ¶ 31; Lewis Decl. ¶¶ 32-33; Morris Decl. ¶¶ 30-31; Sawhney Decl. ¶¶ 34-35.

### 5. *Post-Delivery*

Drivers must "demonstrate the transfer of custody and control of the controlled substances to the Destination [Retailer] in accordance with Customer requirements and Government Requirements." Mills Decl. ¶ 22. This is done through the return of documentation and "totes," or empty containers. Receipts are signed by the Retailer and returned to TXX daily with manifests. Thomas Decl. ¶ 28; Dean Decl. ¶ 26. The totes are returned to the TXX facility daily, but there is

16

no record made of the time of return. Hunt Dep. at 59-60. The TXX facility in Hauppauge does not

close, Hunt Dep. at 60, and there is no specific deadline for the return of the totes. Plaintiffs claim

that in addition to returning the empty containers, they were required to call in to a TXX dispatcher

to verify completion of deliveries. Thomas Decl. ¶ 30; Dean Decl. ¶ 28; Lewis Decl. ¶ 28; Morris

Decl. ¶ 28; Sawhney Decl. ¶ 28.

According to TXX, the Drivers may make arrangements amongst themselves "to consolidate

the effort by selecting a [Driver or Driver-Corporation] or selected vehicle operator(s) to return

multiple [Driver or Driver-Corporation] custody and control documents and totes to TXX." Mills

Decl. ¶ 22. Plaintiffs do not reference or dispute the availability of this option in their submissions.

### 6. Invoicing and Payment

TXX does not guarantee Drivers a weekly minimum or maximum salary. TXX generates an

invoice for each Driver-Corporation and then pays it. Hunt Dep. at 111-12. The invoice represents

TXX's "record of services performed by each [Driver] or its selected vehicle operator during a

specific period." Mills Decl. ¶ 20. Drivers can correct TXX's calculation or "accept payment as

calculated by TXX." *Id.* TXX pays the Driver-Corporation, not the Driver individually, and pays

the Driver-Corporation a fuel surcharge. *See,* Hunt Dep., Ex. 8; *id.* at 116.

Various deductions are taken from the invoice amount. For example, there is an

administrative fee charged by TXX, the amount of which may be negotiated by the Driver-

Corporation. Hunt Dep. at 113. The Non-Party Drivers indicate that their Driver-Corporations

decided not to invest in recordkeeping devices, but decided to pay TXX for recordkeeping services

by paying TXX an administrative fee. Gerlett Decl. ¶ 4; Gonzalez Decl. ¶ 4. In addition, TXX

requires that the Driver-Corporations carry accident insurance and offers coverage to Driver-

17

Corporations that choose not to obtain their own policies. In those instances, there is a deduction made for that coverage. It is undisputed that Drivers have the option to obtain their own insurance. *See* Thomas Decl. ¶ 51; Dean Decl. ¶ 48; Gerlett Decl. ¶ 32.[7]

There is also a deduction for the optional weekly rental of the scanners used by the Driver-Corporations. The invoice used as an exhibit at Hunt's deposition showed a weekly charge of $15, but some Driver-Corporations have negotiated a lower rate or do not pay at all. Hunt Dep. at 118. Driver-Corporations are free to obtain their own scanners.

It is further undisputed that Plaintiffs receive no fringe or employee benefits from TXX or its Customers. In addition, TXX does not withhold payroll taxes or issue W-2s for Plaintiffs. *See* Hunt Dep. at 62.

**D. Other Factors**

### *1. Equipment and Staffing*

The Drivers own their own vehicles, TXX imposes no restrictions on the use of the vehicles, and Plaintiffs acknowledge that they drive them for personal use. Plaintiffs state that TXX "required" the use of a van of a "certain size" and weighing less than 10,000 pounds. *See* Thomas Decl. ¶ 10; Dean Decl. ¶ 8. TXX, however, claims that the Drivers use a variety of vehicle types including cargo vans, mini vans, passenger vehicles, hybrid passenger vehicles, and standard vans. Mills Decl. ¶ 30; *see also id.*, Ex. EE (non-party business LZR Transportation uses 1 full size van, 4 minivans, and 4 cars). Plaintiffs themselves drive cargo vans, *see* Thomas Decl. ¶ 10; Dean Decl.

---

[7]One Plaintiff claims that "$20 was automatically deducted from my paycheck each week in order to pay for a TXX vehicle to pick up totes and returns from my route." Thomas Decl. ¶ 31. Thomas does not indicate the basis for the deduction, *i.e.,* whether it was imposed because he was failing to complete part of his job or whether he was somehow excepted from the requirement of returning totes and returns and thus was being charged when he should not have been.

¶ 8; Lewis Decl. ¶ 8, and a minivan.  Sawhney Decl. ¶ 7.  Plaintiffs do not claim that they are required to affix any TXX signage to their vehicles, and indeed, the Non-Party Drivers state that their vehicles do not bear TXX signs.  Gerlett Decl. ¶ 35; Gonzalez Decl. ¶ 31; Zamora Decl. ¶ 37; *see also* Gualipa Decl. ¶ 31 (vehicles bear name "Edgar G. Services").

Many of TXX's Customers require the use of scanners to track their merchandise.  The IC Agreement provides that the Driver is not required to purchase or rent equipment from TXX "as a condition of entering into this Agreement but may do so at their own discretion."  IC Agreement ¶ NINTH.  TXX gives Drivers the option of renting scanners from it or securing their own.  Mills Decl. ¶ 8.  The Non-Party Drivers confirm that they have the choice to purchase the electronic scanner or to lease one from TXX, and have chosen to use TXX's scanners "due to strategic cost considerations."  *See* Gerlett Decl. ¶ 33; Gonzalez Decl. ¶ 29; Gualipa Decl. ¶ 29;  Zamora Decl. ¶ 35.

Drivers are allowed to hire other Drivers or helpers to work for their business entities without TXX's permission or approval, but must provide TXX with drivers' licenses for each such Driver.  While Plaintiffs Thomas and Dean have not apparently hired helpers, the business entities for 21 of the opt-in Plaintiffs have submitted drivers licenses to TXX for additional Drivers, and nine of those 21 have submitted drivers licenses for two or more additional Drivers.  Baquero Decl. ¶ 14, Ex. I. Indeed, opt-in Plaintiff Lewis, who has submitted a declaration in opposition to the motion, has submitted six additional licenses to TXX as Drivers for Lewis's Driver-Corporation, Derek D. Lewis, DBA ("DDL DBA").  The Non-Party Drivers who submitted declarations have also taken advantage of this provision, *see* Zamora Decl. ¶ 1, 5 (12 Drivers); Gerlett Decl. ¶ 1, 5, 37 (two Drivers); Gonzalez Decl. ¶ 1, 5 (four Drivers); Gualipa Decl. ¶ 1, 5 (five Drivers), and further note

19

that each of their Driver-Corporations can engage "whoever it chooses" and TXX's permission is not required.  Gerlett Decl. ¶ 24; Gonzalez Decl. ¶ 20; Gualipa Decl. ¶ 20; Zamora Decl. ¶ 26.

### 2.  Training and Meetings

Plaintiffs claim that they were required to attend mandatory meetings and training sessions.  There is no suggestion that daily or routine meetings were held.  With the exception of one evening meeting purportedly held sometime in 2010, *see* Dean Decl. ¶ 44; Thomas Decl. ¶ 48,  Plaintiffs have provided no specifics regarding the frequency or duration of any meetings, or how they determined their attendance to be required.  An Interoffice Memorandum dated January 18, 2002 regarding a mandatory independent contractor meeting appears as an exhibit to the Hunt deposition.  *See* Weiner Decl., Ex. B.  That memorandum announced that four open meeting dates were scheduled during evenings in January 2002, and that every independent contractor was required to participate in one meeting.  The subject matter of the meeting is not disclosed, but the memorandum promises that the meeting "will be brief and to the point."

The parties do agree that TXX provided a demonstration of the scanners.  According to TXX, this occurred on one occasion in July 2009 and has not been repeated subsequently.  Mills Decl. ¶ 27.  The Non-Party Drivers assert that neither TXX nor its Customers provides training, direction or supervision of their Driver-Corporations' personnel.  Gerlett Decl. ¶ 13; Gonzalez Decl. ¶ 11; Gualipa Decl. ¶ 11; Zamora Decl. ¶ 15.

### 3.  Appearance and Identification

Plaintiffs do not claim that TXX imposes any personal appearance or grooming requirements on them.  Plaintiffs' declarations regarding whether they were required to wear uniforms are somewhat contradictory. Plaintiff Dean, who drove for TXX from September 2008 to January 2012,

claims that TXX required Plaintiffs to wear uniforms or tee shirts saying either "TXX" or "Transportation."  Dean Decl. ¶ 10.  Plaintiff Thomas claims that TXX stopped making Drivers wear uniforms "[r]oughly ten years ago," or circa 2003, and stopped giving out t-shirts saying TXX or transportation after the lawsuit was filed.  Thomas Decl. ¶ 12.  TXX notes that uniforms and/or shirts have not been required for some time.

It is undisputed that Plaintiffs were provided with TXX identification badges that they were required to bring to the TXX facility.  *See* Hunt Dep. at 140-41; Dean Decl. ¶ 11; Thomas Decl. ¶ 13.  While Plaintiffs were required to wear the ID badges while on TXX premises for security purposes, there is no evidence that they had to be worn during delivery routes.

### 4.  Requests for Time Off and Alleged Disciplinary Actions

Plaintiffs generally claim that they must request unpaid days off or risk having their routes taken away.  Dean Decl. ¶ 15; Thomas Decl. ¶ 16; Morris Decl. ¶ 13; Sawhney Decl. ¶ 16.  The Review, acknowledged by each Plaintiff and set forth *supra,* states that the Driver "agrees to find a replacement to make deliveries if he is unable to complete them."  Baquero Decl., Ex. M, N.  TXX notes that Drivers "that become unavailable or choose for whatever reason not to provide service for a certain period of time can contract with another [Driver] to provide the service or indicate to TXX that service cannot be provided, and TXX will endeavor to secure replacement" Drivers.  Mills Decl. ¶ 29.

TXX asserts that no Driver or Driver-Corporation has ever been "fired" or "disciplined," but rather that the consequence of a Driver's "failure to perform in accordance with the outcome desired by the customer may mean a lost opportunity to provide future service."  Mills Decl. ¶ 26.  Plaintiff Dean states that "TXX terminated my employment in January of 2012 because I took a day off of

work." Dean ¶ 52. Opt-in Plaintiff Lewis claims that he was "terminated" in September 2013 for not coming in to work one day. Lewis Decl. ¶ 17. As to Lewis, TXX states that his Driver-Corporation, DDL DBA, is "no longer engaged by TXX" because on several occasions, DDL DBA "failed to e[i]ther make the deliveries it agreed to make, engage another [Driver] to do so, or inform TXX that it would not be making deliveries before or during the change of custody or control" of the freight. Mills Decl. ¶ 53.

### 5. Additional Job Opportunities

It is undisputed that the relationship between the Drivers and TXX is non-exclusive and that the Drivers may take assignments from, and perform services for, other businesses. The Non-Party Drivers state that they are free "to not perform Services for TXX and/or to perform or not perform Services for other businesses and/or customers other than TXX" and that they can simultaneously carry freight for other customers as long as "all concerned are notified" and there are no legal restrictions or rules that would prohibit mixing types of freight. Gerlett Decl. ¶ 21; Gonzalez Decl. ¶ 17; Gualipa Decl. ¶ 17; Zamora Decl. ¶ 23. Plaintiff Thomas acknowledges that he is "technically allowed to work for other delivery companies," but claims that there is no time to do so. Thomas Decl. ¶ 7. Also, as the freight brokered by TXX is pharmaceutical, "I cannot take other types of cargo with me on my route, thus taking away my opportunity to work for another carrier." *Id.*

### 6. Hours Worked

Plaintiff Thomas states that he has provided services to TXX for over 15 years and that he typically works 15 hours a day Monday through Friday and 7 hours a day on Saturday and Sunday, for an average weekly total of 89 hours. Thomas Decl. ¶¶ 3, 32. Plaintiff Dean provided services to TXX from September 2008 to January 2012, and worked 12 hours a day Monday through Friday

and 7 hours on Saturday and Sunday, for a weekly average of 67 hours.  Dean Decl. ¶¶ 3, 29.

The opt-in plaintiffs who provided declarations also set forth their claimed hours.  For two years, Lewis worked 45 hours a week, Monday through Friday.  Lewis Decl. ¶¶ 3, 29.  Morris worked for over 12 years, 12 hours a day Monday through Friday and 5 hours on Saturday for an average weekly total of 65 hours.  Morris Decl. ¶¶ 3, 29.  Sawhney also worked for 12 years, 12 hours a day Monday through Friday and 7 hours on Saturday for a weekly total of 67 hours per week.  Sawhney Decl. ¶¶ 3, 29.

## II.  PROCEDURAL HISTORY

### A.  This Litigation

The Complaint in this case was filed on May 9, 2013.  Numerous putative opt-in Plaintiffs filed Consents to Sue prior to Defendants' filing of an answer.   There has been no motion to conditionally certify the class or for Rule 23 class certification.  Defendants' motion for judgment on the pleadings was terminated, *see* Order, DE [113], and Defendants filed the instant motion for summary judgment.  That motion was referred to this Court for report and recommendation.

### B.  New York State Department of Labor Proceedings

The parties have both submitted "supplemental authority" regarding the decisions issued by the New York State Depart of Labor Unemployment Insurance Division ("NYS DOL") pertaining to whether opt-in Plaintiff Joseph Morris was an employee.  By letter dated November 25, 2013, the NYS DOL made an initial determination that Morris was an employee of TXX.  *See* DE [97], Ex. A.  TXX requested a hearing, which request was forwarded to the NYS DOL Employer Appeals Unit.  *Id.*  After conducting a hearing, the Unemployment Insurance Appeal Board issued a decision dated April 15, 2015 finding that "[t]he credible evidence fails to establish that [TXX] exercised

supervision, direction and control over [Morris] and other individuals similarly situated to establish an employer/employee relationship." DE [156-1]. Decision, at 11. The Administrative Law Judge noted that while there were "some factors which could establish employee status, . . . substantial evidence supports that individuals similarly situated to [Morris] are independent contractors," *id.,* and thus concluded that Morris was an independent contractor. *Id.* at 13. The Commission of Labor appealed this Decision on April 29, 2015. *See* DE [157-1].

The Court takes note of these decisions as the parties have seen fit to supplement their filings to include them. It is clear, however, that the determinations of the Unemployment Insurance Division "lack[] preclusive effect in a subsequent action or proceeding." *Silberzweig v. Doherty,* 76 A.D.3d 915, 916, 908 N.Y.S.2d 39 (1st Dep't 2010) (citing N.Y. LAB. LAW § 623 (2)). Applying section 623 of the New York Labor Law, "numerous district courts in this Circuit and state courts in New York have declined to give preclusive effect to decisions rendered in unemployment proceedings." *Henry v. Concord Limousine, Inc.,* No. 13-CV-0494, 2014 WL 297303, at *7 (E.D.N.Y. Jan. 24, 2014) (citing cases). Thus the Court has afforded no weight to either of these decisions in rendering its report and recommendations.

## DISCUSSION

## I. LEGAL STANDARDS

Summary judgment is only appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). To survive the motion, the

24

non-moving party has the burden of presenting specific evidence demonstrating a genuine dispute.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *see also Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (if the movant carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" and must "do more than simply show that there is some metaphysical doubt as to the material facts" (citations omitted)).

A grant of summary judgment is appropriate "only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact." *Arena v. Plandome Taxi, Inc.,* No. 12 CV 1078, 2014 WL 1427907, at *2 (E.D.N.Y. Apr. 14, 2014) (citing *Viola v. Philips Med. Sys.,* 42 F.3d 712, 716 (2d Cir. 1994)). The motion may not be defeated simply by relying on the allegations in the complaint, "or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir. 1996).

## II. Independent Contractor Analysis

The key issue in this case is whether Plaintiffs were, or are, employees of TXX or independent contractors. If the latter, their case must be dismissed as independent contractors are not covered by either the FLSA or NYLL. *See generally Hart v. Rick's Cabaret Int'l, Inc.,* 967 F. Supp. 2d 901, 911 (S.D.N.Y. 2013) (identifying central issue as whether plaintiffs were employees or "independent contractors outside the reach of these statutes"); *Browning v. CEVA Freight, LLC,* 885 F. Supp. 2d 590, 597 (E.D.N.Y. 2012). While the determination of this issue under the FLSA is substantially similar to that under the NYLL, there is a difference in focus that warrants separate analyses. *See Landaeta v. New York & Presbyterian Hosp., Inc.*, No. 12 Civ. 4462, 2014 WL

836991, at *4 (S.D.N.Y. Mar. 4, 2014) (noting that FLSA looks to the economic reality of the relationship while New York law focuses on the degree of control exercised by the employer). Despite the different emphasis, "there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Hart,* 967 F. Supp. 2d at 924. Although some courts analyze the two tests together, this Court will consider each separately. *See generally Saleem v. Corp. Transp. Grp., Ltd,* 52 F. Supp. 3d 526, 537 (S.D.N.Y. 2014) (opting to conduct separate inquiries in the absence of direct ruling from the New York Court of Appeals on whether the tests are the same).

As a threshold issue relevant to both inquiries, the Court first considers the extent to which the various IC Agreements executed by TXX and Plaintiffs impact the analysis. The IC Agreements purport to govern the relationship between TXX and Plaintiffs, however, "[i]t is crucial to note that the Agreement itself is not dispositive." *Browning,* 885 F. Supp. 2d at 599; *see also Matter of Pepsi Cola Buffalo Bottling Corp.,* 144 A.D.2d 220, 222, 534 N.Y.S.2d 532 (3d Dep't 1988) (noting that "language in an agreement to the contrary notwithstanding, if the evidence establishes that sufficient supervision, direction and control is exercised over the drivers, an employer-employee relationship may be found"). While the mere existence of the IC Agreements is not dispositive in determining whether Plaintiffs were independent contractors, the evidence is not without weight. "The fact that a contract exists designating a person as an independent contractor is to be considered, but is not dispositive." *Araneo v. Town Bd. for Town of Clarkstown,* 55 A.D.3d 516, 518, 865 N.Y.S.2d 281, 283-84 (2d Dep't 2008) (citing cases). With this in mind, the Court turns to its analysis of whether the relationship is employee-employer or independent contractor under the FLSA and NYLL.

26

## A. FLSA

Whether an employer-employee relationship exists under the FLSA is a question of "economic reality." *Velu v. Velocity Express, Inc.,* 666 F. Supp. 2d 300, 305 (E.D.N.Y. 2009) (quoting *Goldberg v. Whitaker House Coop., Inc.,* 355 U.S. 28, 33, 81 S. Ct. 933 (1961) (citations omitted)). It is a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Barfield v. New York City Health & Hosp. Corp.,* 537 F.3d 132, 141-42 (2d Cir. 2008). The inquiry focuses upon "whether 'the workers depend upon someone else's business for the opportunity to render service or are in business for themselves.'" *Landaeta,* 2014 WL 836991, at *4 (quoting *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir. 1988)). Although the Second Circuit has used "at least two tests with different purposes in determining the economic reality of a relationship," the Court has found the test set forth in *Brock* to be "broader and typically more relevant for distinguishing between independent contractors and employees." *Velez v. Sanchez,* 693 F.3d 308, 326 (2d Cir. 2012) (citing *Zheng v. Liberty Apparel Co.,* 335 F.3d 61, 67-68 (2d Cir. 2003)).[8]

The factors set forth in *Brock* to determine the economic reality of the relationship include: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Brock,* 840 F.2d

---

[8]Other Courts have acknowledged that the Second Circuit has used variations of these factors under different circumstances. *See Plandome Taxi,* 2014 WL 1427907, at *3-4; *Arena v. Delux Transp. Servs., Inc.,* 3 F. Supp. 3d 1, 9-10 (E.D.N.Y. 2014). This Court has reviewed the various sets of criteria and concludes that the *Brock* factors are most appropriate in the context of this case.

at 1058-59. The test is "intended to be broad 'so that the [provisions will] have the widest possible impact in the national economy.'" *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 700 (S.D.N.Y. 2005) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir.1984)). No one factor is dispositive, but rather the court must look to the totality of the circumstances. *Brock,* 840 F.2d at 1059. Moreover, the *Brock* factors are not exhaustive and the court may "consider any other factors it deems relevant to its assessment of the 'economic realities.'" *Zheng,* 355 F.3d at 72.

In addition, for the purposes of summary judgment, "[t]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts–whether workers are employees or independent contractors–is a question of law." *Brock,* 840 F.2d at 1059. Thus, a court may make a finding of law regarding characterization of a worker as an employee or an independent contractor when there are no disputed issues of material fact. *See Browning,* 885 F. Supp. 2d at 598.

### 1. Degree of control exercised by the employer over the workers

Plaintiffs were not "assigned" work by TXX, but rather bid for particular routes or areas. Upon exercising their choice to bid for a route, they controlled the geographic area of their deliveries. Once in possession of an area, each Plaintiff could make the deliveries himself or outsource the deliveries to another Driver without TXX approval. When one Driver failed to take a route, the other Drivers could bid for that work. There is also no evidence that TXX conducted performance reviews of the Drivers, subjected them to ride-along observations, or otherwise evaluated their work.

In addition, Plaintiffs used their own vehicles, which they used for business and personal purposes. These vehicles did not bear TXX logos, and Plaintiffs did not wear uniforms, or have to comply with grooming or appearance standards. Although Plaintiffs do lease scanners from TXX, that arrangement is optional and Plaintiffs have neither suggested nor shown that the scanners are

not available from some other sources. Similarly, although Drivers were required to maintain appropriate insurance, they were free to obtain their insurance from any source. Plaintiffs' allegations that they were required to attend mandatory meetings are undercut by the record, as the evidence shows only two meetings, one in 2002 and one in 2010.

In opposition, Plaintiffs argue that they did not work at their own convenience, were not free to make their own schedules, and "were thoroughly controlled" by TXX. Pls' Mem. of Law at 19, DE [84]. Plaintiffs point to the time restrictions regarding pick-up of the freight as evidence of control exercised over them. Whether Drivers were required to enter through one entrance prior to 5:45 a.m. or a different entrance requiring a sign-in after that time, it is undisputed that Drivers were physically present between 5:30 a.m. and 7:30 a.m. for the morning freight pick-up, a two-hour window, not a specific start time.

The Court notes that there is a certain amount of control dictated by the type of freight, controlled substances, and the resulting Governmental requirements. These constraints, however, are dictated by the nature of TXX's business. Similarly, many of the requirements are imposed by TXX's Customers, not TXX. Specifically, Plaintiffs focus on the lack of their control regarding the actual delivery, including the route, sequence, and timing of the deliveries. Plaintiffs acknowledge, however, that the route is set forth by the manifest and it is undisputed that the manifests are prepared by TXX's Customers, not TXX itself. In addition, Plaintiffs have ultimate control over their routes in the sense that if they do not prefer a particular delivery route, they can bid on a different geographic area as it becomes available. Accordingly, the Court finds it reasonable that TXX "would impose boundaries of this nature in the shipping business." *Browning,* 885 F. Supp. 2d at 602; *see also Velu,* 666 F. Supp. 2d at 307 (noting that plaintiff had a great deal of control over

his work scheduled, "subject to the demands of the clients"); *Edwards v. Publishers Circulation Fulfillment, Inc.,* 268 F.R.D. 181, 186 (S.D.N.Y. 2010) (denying class certification and noting that "the requirements that a specified number of deliveries be made 365 days a year during specified times to specified locations, merely reflect–in an entirely appropriate and understandable way–the intended results of the [defendant company]-deliverer relationship. It is undisputed that they are requirements imposed upon [defendant company] by its clients").

Plaintiffs' remaining arguments concerning Defendants' "control" over their work are vague, conclusory, and lack evidentiary support. Plaintiffs do offer some factual allegations concerning threats of termination, or actual termination, for taking days off. *See* Dean Decl. ¶ 52 ("TXX terminated my employment in January of 2012 because I took a day off of work"); *see also* Sawhney Decl. ¶ 14 (stating he was "fired" when he requested time off until he could get gas in the aftermath of Hurricane Sandy, but acknowledging that TXX had gasoline at the warehouse for Drivers' use).[9] Opt-in Plaintiff Lewis claims to have been threatened with termination on numerous occasions – when he had an accident on the way to work in the winter of 2012, Lewis Decl. ¶ 14, when he requested a day off to attend a funeral in the summer of 2013, *id.* ¶ 15, and when his van wasn't working in September 2013. *Id.* ¶ 16. Lewis claims he was terminated in September 2013 for

_____

[9]Opt-in Plaintiff Sawhney's declaration is replete with allegations of actions purportedly taken by TXX to his detriment. For example, when his deliveries were not made on time, "TXX smothered me with calls which caused so much stress I could have gotten into an accident" Sawhney Decl. ¶ 32; TXX's calls caused him to be ticketed for cell phone use, *id.;* he was ticketed for speeding "because TXX was pressuring me to drive faster than I needed," *id.* ¶ 33; he was humiliated in front of other Drivers and as a result, suffers from high blood pressure, *id.* ¶¶ 53-54; he is a diabetic and was forced to "compromise my health by not taking a meal break." *Id.* ¶20. In addition, deductions were made from his pay for lost, stolen or broken goods, *id.* ¶¶47-49, and when there were times that his van broke down, TXX directed him to make repairs immediately or face having his route taken away. *Id.* ¶ 31. These conclusory allegations, even if true, all speak to Sawhney's difficulties in performing the work he was engaged to do and not to TXX's "control" of him.

missing a day of work while he was incarcerated. *Id.* ¶ 17. TXX claims that is does not "terminate" anyone, but acknowledges that Lewis's Driver-Corporation, DDL DBA, is "no longer engaged by TXX" because on several occasions, DDL DBA "failed to e[i]ther make the deliveries it agreed to make, engage another [Driver] to do so, or inform TXX that it would not be making deliveries before or during the change of custody or control" of the freight. Mills Decl. ¶ 53. Whether he was "terminated" or TXX "no longer engaged" his services, is largely a question of semantics, not an issue of material fact. TXX's decision to cease doing business with Lewis's company, and indeed with any of the Plaintiffs, was within its rights both under the IC Agreement <u>and</u> within the realities of the relationship between the parties and any such decision does not, in and of itself, require the Court to determine that Plaintiffs were employees, or create a question of material fact as to this issue.

The limited control exercised by TXX is driven by the type of business and freight and the requirements of its Customers. Accordingly, this factor weighs in favor of finding that Plaintiffs are independent contractors, not employees.

### *2. Workers' opportunity for profit or loss and their investment in the business*

Plaintiffs claim, again in conclusory fashion and without evidentiary support, that they could not expand their businesses, and suggest that they were completely dependent upon TXX. This argument is belied by the undisputed facts. While some Plaintiffs may well be "dependent" upon TXX in the sense that TXX is the only company to which they provide services, this is their choice, not a situation imposed upon them by TXX. The only factual evidence in the record is that not only are Driver-Corporations permitted to hire additional drivers and use additional vehicles to service multiple routes for TXX and increase the size of their businesses, many in fact do so. *See* Gonzalez

Decl. ¶ 25; Gualipa Decl. ¶ 25; Zamora Decl. ¶ 31; *see also Browning,* 885 F. Supp. 2d at 608 ("whether the Plaintiffs made more money or less money depended largely on their investment in bigger vehicles and hiring additional employees in order to increase their efficiency and capacity").

Further, there is no prohibition on Drivers providing services to other businesses in addition to TXX. *See Browning,* 885 F. Supp. 2d at 603 (finding that plaintiffs "could perform work for other companies, even if it was practically difficult to do so"); *Velu*, 666 F. Supp. 2d at 307 ("Plaintiff has not chosen to avail himself to the opportunity to work for other shipping companies, but that is by choice"). In fact, "if either party were to terminate the Agreement today, Plaintiff[s] could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company." *Velu,* 666 F. Supp. 2d at 307; *see also Browning,* 885 F. Supp. 2d at 610 (plaintiffs "were essentially small businessmen who owned their trucks; hired their own helpers; and had responsibility for their own investment and management."). Mindful that the ultimate inquiry may be couched in terms of whether Plaintiffs are actually in business for themselves, *see Landaeta,* 2014 WL 836991, at *4 (quoting *Brock,* 840 F.2d at 1059), the Court finds that this factor weighs substantially in favor of finding Plaintiffs to be independent contractors.

### *3. Degree of skill and independent initiative required to perform the work*

TXX claims that Plaintiffs are "skilled professional Drivers, with years of business and delivery experience" and suggest that their work requires a high level of skill. Defendants' Mem. of Law at 19-20, DE [131-1]. The Court disagrees. Driving is not a specialized skill, TXX did not require the Drivers to have a commercial driver's license, and Drivers "were not required to demonstrate any level of knowledge upon commencing work" for TXX. *See Saleem,* 52 F. Supp. 3d at 541.

It seems apparent, however, that in order to be successful as a Driver for TXX, some independent initiative is required. As TXX does not guarantee work, it is up to the Plaintiffs to submit bids for routes and then ensure that they have the means to satisfy those jobs, whether through the acquisition of additional vehicles, through the use of additional Drivers or helpers, or both.[10] Where the work at issue does not require a great deal of skill but does require the exercise of independent initiative, the Court concludes that the factor "does not weigh strongly in either direction." *Saleem,* 52 F. Supp. 3d at 542.

### *4. Permanence or duration of the working relationship*

Plaintiffs provided services to TXX over time periods of various length, some of them for many years. *See, e.g.,* Thomas Decl. ¶ 3 (15 years). The IC Agreements, however, are for short, renewable terms of 90 days and may be terminated on ten days notice of the end of each term. Thus despite the longevity of some of the relationships, the brevity of the terms of the Agreements suggests a less permanent arrangement. *See Browning,* 885 F. Supp. 2d at 609-10 (terminable at will, one year renewable agreements do not suggest a permanent relationship); *Edwards v. Cmty. Enter., Inc.,* 251 F. Supp. 2d 1089, 1100 (D. Conn. 2003) (year-to-year contract "suggests that the parties did not anticipate an indefinite relationship"). In addition, although the Agreements are not terminable at will, they are non-exclusive and thus, Plaintiffs are free to seek work from other quarters at any time. In a sense, each bid was essentially a separate job and Plaintiffs were free to submit bids for other routes or to cease servicing an existing route. Accordingly, the Court finds that this factor also weighs in favor of a determination that Plaintiffs were independent contractors.

---

[10]Plaintiffs state that they have not advertised their business names or placed ads in the Yellow pages, but do not deny that they are free to do so. *See* Thomas Decl. ¶ 50; Dean Decl. ¶ 47; Lewis Decl. ¶ 46; Morris Decl. ¶ 42; Sawhney Decl. ¶ 55.

### *5. Extent to which work is integral part of employer's business*

The very nature of TXX's business is to provide transportation for its Customers, a job it would be unable to complete without the Drivers. On the other hand, the record demonstrates that when a particular Driver did not show up, other Driver-Corporations bid for the delivery and transported the freight. Hunt Dep. at 41. In other words, while Plaintiffs' work may be integral to TXX's business, their "work is interchangeable with the work of other drivers; when [they] refuse[] work, other drivers fill in." *Velu,* 666 F. Supp. 2d at 307; *see also Browning,* 885 F. Supp. 2d at 610 (noting that while Drivers were integral, they were also easily replaceable and thus this factor only "weighs slightly" in favor finding an employment relationship).

In light of the ease with which the Drivers are replaced and the freight delivered, the Court finds that this factor weighs in Plaintiffs' favor, but not heavily.

### *6. Totality of the Circumstances*

In sum, based on the undisputed facts set forth above, the Court concludes that Plaitniffs are independent contractors as that term applies under the FLSA. Plaintiffs are in business for themselves. They are free to bid on various routes and to hire additional Drivers and helpers as they see fit and without TXX's approval. The arrangement with TXX is expressly non-exclusive and the evidence establishes that Plaintiffs may provide services to other businesses. Plaintiffs are free to bid on new routes, to reject any assignment, and to negotiate their pay rates. They are paid by the stop, not by the hour, receive no fringe benefits, and do not receive W-2s from TXX. Plaintiffs own their own vehicles, which they may use for personal use or for other business purposes, and there is no TXX sign on their vehicles. Plaintiffs are not required to wear uniforms or conform their appearance in any way.

Any controls imposed by TXX are ancillary to Plaintiffs' independent business and are generated by TXX's Customers, not Defendants.  The control over the facility is partly driven by security issues when dealing with controlled substances, and partly due to the nature of the shipping business.  The deductions taken by TXX for accident insurance and scanner rental are optional and Plaintiffs are free to obtain their own insurance and scanners.  Accordingly, the IC Agreements accurately reflect the economic realities of the relationship between the parties.[11]

Despite Plaintiffs' argument to the contrary, the court's decision in *Browning v. CEVA Freight, LLC* is persuasive.  In that case, Plaintiffs were drivers for Defendant CEVA, a transportation and logistics services company.  *Browning,* 885 F. Supp. 2d at 592.  Although the drivers owned their own vehicles, they leased them back to CEVA.  The vehicles were "covered" with CEVA logos.  Drivers were required to wear CEVA uniforms and to attend mandatory monthly meetings.  According to the independent contractor agreements executed by the parties, drivers could hire helpers, and could determine the manner of performing obligations such as choosing the route traveled.  CEVA issued certain instructions "such as meeting time-sensitive service parameters, when required by CEVA customers" and the drivers were in constant contact with CEVA.  885 F. Supp. 2d at 593.  Drivers could decline any pickup or delivery upon notice to CEVA, and under the agreements, could choose their workdays although in practice, CEVA needed notice so it could find replacements.  Plaintiffs also alleged that they were "forced" to work certain days or times under threat of CEVA giving away their service areas, and that if they refused an assignment, "they could end up with no work for that day."  *Id.*  The drivers also had the right to provide services to other

---

[11]It is apparent that TXX has tweaked its procedures and agreements over time to buttress the independent contractor designation and to avoid being labeled as an employer.  This does not alter the analysis, however.

carriers. On these facts, several of which are more restrictive than those present in this case, the court found the drivers to be independent contractors and granted CEVA's motion for summary judgment.

In their supplemental opposition papers, Plaintiffs further rely upon three recent decisions issued by the Ninth Circuit: *Alexander v. FedEx Ground Package Sys. Inc.,* 765 F.3d 981 (9th Cir. 2014) (applying California labor law); *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033 (9th Cir. 2014) (applying Oregon labor law); *Ruiz v. Affinity Logistics Corp.,* 754 F.3d 1093 (9th Cir. 2014) (applying FLSA and California labor law). As is often the case in these types of litigation, however, the facts are distinguishable and thus none of these cases compels the conclusion that Plaintiffs here are employees.

In *Ruiz,* the drivers were furniture deliverers, who were required to form business entities in order to be hired, and each had to sign an independent contractor agreement and an equipment lease agreement. *Ruiz,* 754 F.3d at 1096. Beyond this similarity, the drivers worked under far more restrictive circumstances. Drivers were "encouraged, if not required" to lease their trucks from Affinity, which were painted white and displayed Affinity's name. *Id.* at 1097. Affinity maintained the trucks, required the use of specific phones which it provided, and required each driver to have a helper who had to be approved by Affinity. Drivers were required to attend daily meetings, to wear uniforms, and to adhere to grooming requirements. Affinity also conducted "follow-alongs" where an Affinity supervisor followed the driver to assess performance. *Id.* at 1098. On these facts, the court determined that Affinity had sufficient control over the plaintiffs and that other factors weighed in favor of a determination that the drivers were Affinity employees. *Id.* at 1105.

The *Alexander* and *Slayman* cases, decided the same day by the same panel of judges,

applied California and Oregon law respectively, and found the plaintiffs to be employees of defendant FedEx. The factual recitation in each case is essentially the same. Plaintiffs were FedEx drivers. There are similarities to the instant case: the drivers had to deliver packages within a specific timeframe, but not by a specific route, and drivers used electronic scanners to transmit delivery data. *Slayman,* 765 F.3d 1038. They also were expected to arrive at the FedEx terminal each morning and remain until all of their packages were available for pickup. There are, however, compelling differences. Drivers were required to return to the terminal by a certain time. FedEx had the authority to "reconfigure" the geographic service area of a driver. *Slayman,* 765 F.3d at 1038. FedEx managers exercised significant control by conducting ride-along performance evaluations. The drivers could hire helpers, or replacement drivers "acceptable to FedEx." *Slayman,* 765 F.3d at 1039. While drivers provided their own vehicles, FedEx had to specifically approve the vehicle and it had to meet specific requirements regarding size, paint color, logos, and interior dimensions. Scanners were required, and though drivers could obtain their own, the court noted that the specific scanners in use "are not readily available from any other source." *Slayman,* 765 F.3d at 1040. Drivers were required to wear uniforms and comply with personal-appearance standards. Managers could refuse to let a driver work if that driver was "improperly dressed or groomed." Finally, with the exception of the delivery time which was selected by FedEx's customer, the procedures put into place were established directly by FedEx, not its customers. Thus, the cases relied upon by Plaintiffs do not apply.

For all the foregoing reasons and examining the totality of the circumstances, the Court finds that Plaintiffs are independent contractors within the meaning of the FLSA. Accordingly, it is recommended that Defendants' motion for summary judgment as to Plaintiffs' FLSA claim be

granted.

## B.  NYLL LAW

Under the NYLL, the "critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 694-95 (2003).  Whether a person is an employee or an independent contractor is "a fact-intensive inquiry that depends upon factors such as whether the person: (1) worked at his [or her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule." *Deboissiere v. American Modification Agency*, 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010) (citing *Bynog*, 1 N.Y.3d at 198, 770 N.Y.S.2d at 695) (additional citation omitted).  While the issue "usually presents questions of fact sufficient to preclude summary judgment, where evidence is undisputed, and the facts are compellingly clear, the issue may be determined as a matter of law." *Sikorski v. Burroughs Drive Apartments, Inc.,* 306 A.D.2d 844, 846, 762 N.Y.S.2d 718, 721 (4th Dep't 2003) (internal quotation and citation omitted).  Applying the factors in this case, it is clear that there is no dispute as to two of them – Plaintiffs were not on TXX's payroll, nor did they receive any fringe benefits.

The Court has already addressed whether Plaintiffs worked at their own convenience in the context of the FLSA analysis regarding the degree of control exercised by TXX.  In addition, it is undisputed that Plaintiffs could hire their own Drivers and helpers to assist them.  As such, "this freedom allowed them to further work at their own convenience." *Browning,* 885 F. Supp. 2d at 601.

Plaintiffs suggest that any reliance upon the *Browning* decision is misplaced because in that case, there was no evidence that shifts would be taken away – "there is no evidence that the Plaintiffs

38

were in fact 'penalized' for turning down assignments." *Browning,* 885 F. Supp. 2d 601. Here, Plaintiffs summarily state that "TXX did not allow me to turn down deliveries or shifts. If I or other drivers turned down deliveries or shifts, we were threatened with having our route taken away." Thomas Decl. ¶ 14; Dean Decl. ¶ 12. Such conclusory statements, devoid of any specifics or evidentiary support, are insufficient to raise an issue of material fact. As in *Browning,* there is no evidence here of penalties being assessed against Plaintiffs for refusing an assignment. Despite finding the claims to be unsubstantiated, the *Browning* court further reviewed the assignment system utilized by that defendant and determined that "while a refusal to complete an assignment may have factored into a subsequent assignment decision, this does not render the refusal subject to a 'penalty.'" *Browning,* 885 F. Supp 2d at 601. The same reasoning applies here. Indeed a contrary result would make no sense. If a company cannot decline to make assignments to underperforming vendors, the result would be a contractual obligation in perpetuity, a result not endorsed by any court.

Further, and as addressed above, there is no question that Plaintiffs were free to engage in other employment. Their arrangement with TXX was non-exclusive and there is no evidence that TXX did anything to prevent Plaintiffs from pursuing other opportunities.

Accordingly, and for the reasons set forth in the Court's FLSA analysis, TXX did not exercise the requisite degree of control under New York law to support a finding that Plaintiffs were its employees. *Cf. Hernandez v. Chefs Diet Delivery, LLC,* 81 A.D.3d 596, 598, 915 N.Y.S.2d 623, 625 (2d Dep't 2011) (plaintiffs found to be employees where defendants provided daily delivery manifests, reimbursed drivers for mileage, required mandatory meetings and one to two weeks of training, required approval for vacation time and banned drivers "from playing loud music while making deliveries)." As the Court finds that Plaintiffs are independent contractors for purposes of

39

the NYLL, it is further recommended that Defendants' motion for summary judgment as to the NYLL claims also be granted, and the case dismissed.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. §636 (b)(1); FED. R. CIV. P. 72; FED. R. CIV. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. Failure to file objections within this period waives the right to appeal the District Court's Order. *See Caidor v. Onondaga County,* 517 F.3d 601, 604 (2d Cir. 2008); *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir. 2003).

Dated: Central Islip, New York
      May 22, 2015

                         /s/ Steven I. Locke
                         STEVEN I. LOCKE
                         United States Magistrate Judge

SPA45

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CECIL THOMAS and JOHN DEAN on
behalf of themselves and all others similarly
situated,

Plaintiffs,

-against-

TXX SERVICES, INC. and PATRICIA
DOUGAN HUNT,

Defendants.
-------------------------------------------------------------X

FEUERSTEIN, District Judge:

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ SEP 3 0 2015 ★

**LONG ISLAND OFFICE**

**ORDER**

13-CV-2789 (SJF)(SIL)

Plaintiffs Cecil Thomas and John Dean (plaintiffs) object to a Report and

Recommendation (R. & R.) of the Honorable Steven I. Locke, United States Magistrate Judge,

dated May 22, 2015, recommending that the Court find that plaintiffs are not employees of

defendants TXX Services, Inc. (TXX) and Patricia Dougan Hunt (defendants), but instead

independent contractors, and that the Court, therefore, should dismiss their federal and state labor

claims under FED. R. CIV. P. 56. Because the Court finds no clear error in Judge Locke's R. &

R., it accepts it in its entirety.

I. STANDARD OF REVIEW

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct

proceedings on dispositive pretrial matters without the consent of the parties. FED. R. CIV. P.

72(b); *see Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir.

2002). Any portion of a report and recommendation on dispositive matters to which a specific,

1

timely objection has been made is reviewed *de novo.* 28 U.S.C. § 636(b)(1); FED. R. CIV. P.

72(b); *see Arista Records, LLC v. Doe 3,* 604 F.3d 110, 116 (2d Cir. 2010). However, the court

is not required to review the factual findings or legal conclusions of the magistrate judge as to

which no proper objections are interposed. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S. Ct.

466, 88 L. Ed. 2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham,*

*Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010) ("[A] party waives [judicial] review of a

decision in a magistrate judge's report and recommendation if the party fails to file timely

objections designating the particular issue."); *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir. 2003)

("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's

report waives further judicial review of the point.").

General objections, or "objections that are merely perfunctory responses argued in an

attempt to engage the district court in a rehashing of the same arguments set forth in the original

papers will not suffice to invoke de novo review . . . [because] [s]uch objections would reduce

the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. New York*

*State Ins.,* 655 F. Supp. 2d 308, 313 (S.D.N.Y. 2009) (alterations, quotations and citations

omitted); *Butto v. Collecto, Inc.,* 290 F.R.D. 372, 379 (E.D.N.Y. 2013) (quotations and citation

omitted). To accept the report and recommendation of a magistrate judge to which such general

or perfunctory objections are made, or to which no specific, timely objection has been made, the

district judge need only be satisfied that there is no clear error apparent on the face of the record.

*See* FED. R. CIV. P. 72(b); *Spence v. Superintendent, Great Meadow Corr. Facility,* 219 F.3d 162,

174 (2d Cir. 2000) (a court may review a report to which no timely objection has been interposed

to determine whether the magistrate judge committed "plain error."); *Libbey v. Village of Atlantic*

*Beach*, 982 F. Supp. 2d 185, 199 (E.D.N.Y. 2013); *7-Eleven, Inc. v. Khan*, 977 F. Supp. 2d 214, 219 (E.D.N.Y. 2013).

     Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); *see Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 F.R.D. 1, 2 (E.D.N.Y. 2013); *North Shore-Long Island Jewish Health Care Sys., Inc. v. MultiPlan, Inc.*, 953 F. Supp. 2d 419, 424 (E.D.N.Y. 2013).

## II.    PLAINTIFF'S OBJECTIONS

     Plaintiffs object to Magistrate Judge Locke's finding that they are independent contractors, who may not recover under federal and state law, as clear error. [Docket Entry No. 160 (Plaintiff's Objections to Report (Pl.'s Obj.) at 1)]. Plaintiffs claim that, "Judge Locke erred by (1) resolving factual disputes in [defendants'] favor; (2) failing to make all reasonable inferences in [their] favor; and (3) "misapplying the [summary judgment] standard." *Id.* at 2.

     Plaintiffs point to record evidence, which, they argue, shows the existence of a genuine issue of material fact as to whether they are employees within the meaning of the FLSA using the five (5)-factor "economic reality" test set forth in *Brock v. Superior Care, Inc. (Superior Care)*, 840 F.2d 1054, 1058–59 (2d Cir. 1988). They point to: the declarations of drivers to show that defendants exercised control over them by: setting rates for routes, threatening to take away their routes if they refused assignments or they did not complete an assignment without finding a replacement driver, forbidding the drivers from dealing directly with customers, requiring them to report to TXX's facility in the morning, setting rules for drivers, and supervising them, evidence that the drivers did not engage in a bona fide bidding process with

defendants, that their work was integral to defendants' business, and that the drivers and defendants had a longstanding business relationship, all of which, they argue demonstrates that they are employees, and not independent contractors. Pl.'s Obj. 3–18. Plaintiffs' objections, are identical to the arguments raised before Magistrate Judge Locke, and therefore, the Court reviews Magistrate Judge Locke's R. & R. only for clear error. *Owusu*, 655 F. Supp. 2d at 313.

Although the "existence and degree" of each factor of the economic reality test is a factual question, the ultimate question of whether a worker is an employee or an independent contractor is a legal question. *Superior Care*, 840 F.2d at 1059. Magistrate Judge Locke correctly found that the parties did not dispute the underlying facts, but instead characterized the facts differently according to their respective legal positions, which does not defeat summary judgment. *See Hoard v. Sizemore*, 198 F.3d 205, 211 (6th Cir. 1999) ("[T]here is no factual dispute, but rather a dispute about how to characterize the undisputed evidence in light of the relevant law."). Magistrate Judge Locke correctly observed that many of plaintiffs' asserted "factual disputes" are semantical, for example whether defendants "terminated" a driver, or "no longer engaged" his services. R. & R. 31. And, although TXX sets the drivers' routes and schedules, and requires them to appear at its facility in the morning, this does not raise a factual issue of "control" because TXX's clients, and the nature of TXX's business dictate these requirements. *Id.* at 29; *cf. Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012) ("[T]hese constraints stemmed from the nature of the business, as opposed to [defendant] in particular. It is reasonable that a company such as [defendant] would impose boundaries of this nature in the shipping business."). In sum, the Court finds no clear error in Judge Locke's legal conclusion that plaintiffs were independent contractors and not employees

4

under both federal and New York law. *Accord Browning*, 885 F. Supp. 2d at 599, 610 (granting summary judgment against drivers on FLSA and NYLL claims on issue of independent contractor status) (citing *Harjes v. Parisio*, 766 N.Y.S.2d 270 (3d Dep't 2003); *Barak v. Chen*, 929 N.Y.S.2d 315 (2nd Dep't 2011)).

### III.    CONCLUSION

For the reasons set forth herein, the Report is accepted in its entirety and, for the reasons set forth in the Report, defendant's motion summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's claims against them is granted.   Under Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court shall serve notice of entry of this Order upon all parties as provided in Rule 5(b) of the Federal Rules of Civil Procedure and record such service on the docket.

SO ORDERED.

/s/
_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: September 30, 2015
       Central Islip, New York

5

SPA50

FILED
CLERK

10/14/2015 2:06 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CECIL THOMAS and JOHN DEAN on behalf
of themselves and all others similarly situated,

               Plaintiffs,

      - against -

TXX SERVICES, INC. and PATRICIA
DOUGAN HUNT,

               Defendants.
-----------------------------------------------------------X

**JUDGMENT**
CV-13-2789 (SJF)(SIL)

     An Order of Honorable Sandra J. Feuerstein, United States District Judge, having been

filed on September 30, 2015, accepting in its entirety the May 22, 2015 Report and

Recommendation of Magistrate Judge Steven I. Locke, and granting defendants' motion for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing

plaintiffs' claims against them, it is

     **ORDERED AND ADJUDGED** that plaintiffs take nothing of defendants; and that

defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure dismissing plaintiffs' claims against them is granted.

Dated: Central Islip, New York
       October 14, 2015

                            DOUGLAS C. PALMER
                            CLERK OF THE COURT

             By:    /s/ Catherine Vukovich
                    Deputy Clerk